[No. S004758. Nov. 19, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
TEOFILO MEDINA, JR., Defendant and Appellant.

COUNSEL

Fern M. Laetham, State Public Defender, under appointment by the Supreme Court, Michael Pescetta and Sarah Plotkin, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Frederick R. Millar, Jr., Pat Zaharopoulos and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Defendant Teofilo Medina, Jr., appeals from a judgment imposing the death penalty following his conviction of three counts of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), accompanied by three special

circumstance findings, namely, robbery-murder (§ 190.2, subd. (a)(17)(i)), burglary-murder (*id.*, subd. (a)(17)(vii)), and multiple murder (*id.*, subd. (a)(3)). Additionally, defendant was convicted of several counts of robbery (§ 211), second degree burglary (§ 459), false imprisonment (§ 236), assault with a deadly weapon (§ 245, subd. (a)(2)), and possession of a firearm by an ex-felon (§§ 12021, 12021.1).

The jury found that the three murders were premeditated and deliberate, and that defendant was sane at the time of the offenses. The jury returned a verdict of death, and the trial court denied defendant's motion to modify the sentence (§ 190.4, subd. (e)). The court imposed the death penalty for the three murders, and a determinate nineteen-year, four-month sentence for the other offenses. Defendant's appeal is automatic. (§ 1239, subd. (b).) Subsequent to the filing of this appeal, defendant filed a habeas corpus petition which we denied without issuing an order to show cause.

## I. Facts

### A. *The Offenses*

From October 13 to November 7, 1984, defendant engaged in a crime spree, stealing a gun from a pawnshop, holding up two gas stations, a drive-in dairy, and a market, killing three employees of these establishments (Horacio Ariza, Douglas Metal and Victor Rea), attempting to rob a fourth employee (Moon Yoon), and shooting at two citizens (Cynthia Police and Daniel Barrow) who attempted to follow his getaway car.

Defendant was apprehended after police traced his car to his residence. Police found a gun in defendant's home that, according to prosecution experts, was used to fire the bullets found in the three murder victims. Although other family members lived with defendant, the testimony of his two sisters indicated the gun belonged to him.

Defendant challenged some of the circumstantial evidence linking him to the crimes, but (other than asserting an insanity defense) he neither denied his guilt nor offered any alibi defense.

### B. *Competency Phase*

Prior to trial, defendant moved for a competency hearing (§ 1368), claiming his present inability to cooperate with counsel. At the hearing, in addition to lay witnesses, various psychiatrists and other experts testified about defendant's possible paranoid schizophrenia, his violent and aberrant behavior, his attempted suicide, and his inability to cooperate with counsel.

Dr. Gold, a psychiatrist who knew defendant while he was in the Arizona prison system, testified that defendant was a paranoid schizophrenic and was incompetent to assist his attorney at trial. Dr. Echeandia, a clinical psychologist at the Orange County jail, doubted the accuracy of the schizophrenia diagnosis, and could not express an opinion on defendant's competence to stand trial. Dr. Sharma, a psychiatrist, likewise expressed doubts regarding the schizophrenia diagnosis and leaned toward a finding of competence. Dr. Pierce, a psychologist, believed defendant was schizophrenic, with impaired memory and hallucinations, but nevertheless was competent to stand trial. Dr. Sakurai, a jail psychiatrist, opined that although defendant suffered from depression, he was competent, and that he may have been malingering. Dr. Sheffield, who treated defendant for knife wounds he incurred in jail, could give no opinion on the competency issue.

At the conclusion of the competency hearing, the jury found defendant competent to stand trial.

## C. *Sanity Phase*

At the sanity phase, Dr. Gold stated his opinion that defendant was a paranoid schizophrenic who was not guilty of the charged offenses by reason of insanity. Dr. Pierce concluded that although he believed defendant suffered from paranoid schizophrenia, he lacked data from which he might deduce defendant was insane when the offenses occurred. Dr. Sharma agreed that, whether or not defendant was schizophrenic, there was insufficient evidence suggesting he was insane during the offenses. Finally, Dr. Klatte, a psychiatrist, found no evidence of any mental disturbance that might have precluded defendant from knowing the nature of his acts or their wrongfulness.

Defendant took the stand during the sanity phase and testified (along with other lay witnesses) about his background, including his prior offenses and convictions, prison terms, drug use, violent and aberrant behavior, attempted suicide, confinement in a state mental hospital, and attempted escape therefrom. According to defendant, he could not recall shooting the victims, although he remembered being chased by Cynthia Police and shooting over her head.

The jury found defendant was legally sane at the time of the offenses.

## D. *Penalty Phase*

The prosecution introduced evidence of defendant's prior violent acts, including his murder of another gas station attendant (Martin) during a

robbery, assault on a man (Sanchez) in a bar, assault on a prison inmate (Hillyer), and rape (Whitacre). The defense relied on mitigating testimony from Drs. Pierce, Sharma, Sakuri, and Klatte regarding defendant's mental impairment, personality disorder and low intelligence. Defendant's father testified regarding defendant's childhood injury, glue sniffing, and unusual behavior (on one occasion, defendant attempted to pull out his own eyelashes).

## II. Competency Phase Contentions

### A. *Validity of Section 1369, Subdivision (f)*

■ Defendant first contends that section 1369, by placing the burden on him to prove his incompetence to stand trial, is unconstitutional as a denial of due process and equal protection under the state and federal Constitutions. (In fact, none of defendant's authorities involves or discusses equal protection concerns, and he makes no separate argument on the point. Accordingly, we conclude that his argument is essentially a due process challenge to the statutory burden allocation.)

Section 1369, subdivision (f), provides in pertinent part that "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent. The verdict of the jury shall be unanimous." The jury was instructed in accordance with this provision. (CALJIC No. 4.10.)

Before addressing defendant's challenge, we set forth the relevant legal principles. Section 1368, subdivision (a), provides that if "a doubt arises in the mind of the judge as to the mental competence of the defendant," the court shall inquire of defense counsel regarding the defendant's competence and, if counsel believes defendant may be incompetent, the court shall order a hearing on the matter. The section further provides that even if defense counsel believes his client is competent, the court may, in its discretion, order a competency hearing. (§ 1368, subd. (b).) Once the hearing is ordered, "all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined." (*Id.*, subd. (c).)

■ It has long been established that the conviction of an accused while he is legally incompetent violates due process. (*Pate* v. *Robinson* (1966) 383 U.S. 375, 385 [15 L.Ed.2d 815, 822, 86 S.Ct. 836].) Indeed, the United States Supreme Court has held that the failure of a trial court to employ procedures to protect against trial of an incompetent defendant deprives him of his due process right to a fair trial and requires reversal of his

conviction. (*Ibid.*; see *Drope* v. *Missouri* (1975) 420 U.S. 162, 171 [43 L.Ed.2d 103, 112-113, 95 S.Ct. 896].) Our decisions hold that a competency hearing is required whenever substantial evidence of the accused's incompetence has been introduced. (*People* v. *Hale* (1988) 44 Cal.3d 531, 538-539 [244 Cal.Rptr. 114, 749 P.2d 769]; *People* v. *Stankewitz* (1982) 32 Cal.3d 80, 91-92 [184 Cal.Rptr. 611, 648 P.2d 578]; *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283 [61 Cal.Rptr. 644, 431 P.2d 228].)

■ Defendant argues that because fitness to stand trial is fundamental to an adversary system of justice (*Drope* v. *Missouri, supra,* 420 U.S. 162, 171-172 [43 L.Ed.2d 103, 112-113]), due process dictates that once the defendant has raised a bona fide doubt as to his competence, the state must carry the burden of proving him competent. Accordingly, defendant argues, section 1369 and its contrary allocation of the proof burden should be declared unconstitutional.

The validity of section 1369, its presumption of competence and burden of proof allocation, apparently has never been discussed in a published opinion. (Cf. *People* v. *Bye* (1981) 116 Cal.App.3d 569, 573-578 [172 Cal.Rptr. 186] [constitutional to permit *prosecution* to establish defendant's incompetence by mere preponderance of evidence]; *People* v. *Eckstrom* (1977) 71 Cal.App.3d 259, 261-262 [139 Cal.Rptr. 341] [constitutional to require defendant to prove his *insanity*].) The cases from other state and federal jurisdictions are in conflict on the constitutional propriety of placing on the defendant the burden of proving his own incompetence.

Some cases suggest that due process principles forbid requiring a defendant whose competence is in doubt to carry the proof burden. (See *United States* ex rel. *Bilyew* v. *Franzen* (7th Cir. 1982) 686 F.2d 1238 (*Bilyew*); *United States* v. *DiGilio* (3d Cir. 1976) 538 F.2d 972, 986-989, cert. den. 429 U.S. 1038 [50 L.Ed.2d 749, 97 S.Ct. 733] (*DiGilio*); *State* v. *Jones* (S.D. 1987) 406 N.W.2d 366, 368-369 [decision based on state constitutional law]; *People* v. *McCullum* (1977) 66 Ill.2d 306 [362 N.E.2d 307, 310-311] [same].)

Other cases find no due process or other constitutional objection to placing the proof burden on a defendant who has asserted his own incompetence. (See *Lowenfield* v. *Phelps* (5th Cir. 1987) 817 F.2d 285, 294, sub. opn. (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546]; *State* v. *Pruitt* (1984) 18 Ohio App.3d 50 [480 N.E.2d 499, 509] [conc. opn.]; cf. Robinson, Criminal Law Defenses (1984) § 208(c), p. 505 [burden of production "is usually on the party seeking to establish the incompetency; this is usually the defendant"]; *State* v. *Pedersen* (Iowa 1981) 309 N.W.2d 490, 496 [same].)

The first line of cases stresses the unfairness of requiring a defendant who might be incompetent to shoulder the burden of proving it. In *DiGilio*, for example, the court observed that the United States Supreme Court had found it "contradictory" to suggest that a defendant may be incompetent yet capable of knowingly waiving his right to raise the issue. (538 F.2d at p. 988, citing *Pate* v. *Robinson, supra,* 383 U.S. at p. 384 [15 L.Ed.2d at p. 821].) According to *DiGilio*, it is similarly contradictory to argue that a possibly incompetent defendant is nonetheless presumed to possess sufficient intelligence to adduce evidence of his incompetency. (538 F.2d at p. 988.)

*DiGilio* involved federal procedure, and thus had no occasion to discuss the constitutionality of state statutes allocating the proof burden to the defendant. But in *Bilyew, supra,* 686 F.2d 1238, the court found unconstitutional an Illinois statute that placed the burden of proving incompetence on the defendant. The court stated, "There is little question that the Fourteenth Amendment requires the State or federal prosecution to shoulder the burden of proving that the defendant is fit to stand trial once the issue of unfitness has been properly raised. [Fn. omitted.] Every court that has considered the issue has so held. [Citations.]" (*Id.,* at pp. 1244-1245.)

The *Bilyew* court agreed with the reasoning of Illinois state court decisions (e.g., *People* v. *McCullum, supra,* 362 N.E.2d 307, 310-311) that if we assume a defendant is incompetent and unable to cooperate with counsel, it would be a "strange rule" to impose on him the burden of proving his incompetence, for the very disability he seeks to prove may render him incapable of proving it. (*Bilyew, supra,* 686 F.2d at p. 1245.)

On the other hand, despite *Bilyew*'s assertion, there is substantial authority supporting a contrary view. The United States Supreme Court has consistently upheld state statutes imposing on the defendant the burden of establishing his own *insanity*, despite the possibility that his mental condition may well prevent an effective showing. (*Leland* v. *Oregon* (1952) 343 U.S. 790, 798-799 [96 L.Ed. 1302, 1308-1309, 72 S.Ct. 1002] (*Leland*); see *Martin* v. *Ohio* (1987) 480 U.S. 228, 236 [94 L.Ed.2d 267, 275-276, 107 S.Ct. 1098] [upholding, against due process attack, Ohio statute placing proof burden on defendant claiming self-defense]; see also *Rivera* v. *Delaware* (1976) 429 U.S. 877 [50 L.Ed.2d 160, 97 S.Ct. 226] [dis. opn. on dismissal of appeal].)

In *Leland*, the high court upheld an Oregon statute requiring the defendant in a criminal case to prove his insanity beyond a reasonable doubt. The court observed that the state must prove only those facts encompassing elements of the crime charged, and that sanity is not such an element. (343

U.S. at pp. 798-799 [96 L.Ed.2d at pp. 1308-1309].) The court rejected a due process challenge, stating that "we are therefore reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice." (*Id.*, at p. 799 [96 L.Ed. at p. 1309].)

*Leland* remains good law. As the high court recently indicated in upholding an Ohio statute requiring the defendant to carry the burden of proving self-defense, *Leland* has withstood repeated challenge (see, e.g., *Rivera* v. *Delaware, supra,* 429 U.S. 877) and is "authority for our decision today." (*Martin* v. *Ohio, supra,* 480 U.S. at p. 236 [94 L.Ed.2d at p. 276]; see also *Patterson* v. *New York* (1977) 432 U.S. 197, 201-205 [53 L.Ed.2d 281, 286-289, 97 S.Ct. 2319] [following *Leland*].) If we applied *Leland* to the present case, section 1369 seemingly would survive a federal due process attack, for defendant's competence to stand trial bears only on his mental state and is no more an element of the crime charged than is his sanity. (See *State* v. *Jones, supra,* 406 N.W.2d 366, 368-369 [acknowledging *Leland* controls federal due process question as applied to competency proof allocation, but adopting different rule under South Dakota Constitution]; cf. *People* v. *Fields* (1965) 62 Cal.2d 538, 540 [42 Cal.Rptr. 833, 399 P.2d 369, 16 A.L.R.3d 708] [competency proceeding not criminal in nature]; *People* v. *Bye, supra,* 116 Cal.App.3d 569, 574 [same].)

Thus, a recent federal case, *Lowenfield* v. *Phelps, supra,* parted company with the *DiGilio* and *Bilyew* cases previously discussed, and upheld a Louisiana statute that, like section 1369, placed on the defendant the burden of proving, by a preponderance of the evidence, his incompetence to stand trial. First, the court observed that no other federal circuit had adopted a contrary approach, and noted that *Bilyew* uncritically adopted Illinois state court cases on the issue. Second, *Lowenfield* reasoned that, although *Congress* unquestionably had placed on federal prosecutors the burden of proving the defendant's competence (e.g., 18 U.S.C. § 4241), that fact did not support *Bilyew*'s assumption that the federal *Constitution* requires the states to conform to federal law. *Lowenfield* noted that, as indicated in *Leland* v. *Oregon, supra,* 343 U.S. 790, 798-799 [96 L.Ed. 1302, 1308-1309], the states ordinarily have great latitude to decide the proper placement of proof burdens. Accordingly, the *Lowenfield* court concluded, "We see no reason why Louisiana should be prohibited from placing the burden of proving incompetency on the defendant merely because Congress chose to place that burden on the government in federal prosecutions." (817 F.2d at p. 294.)

We conclude that the Fifth Circuit's holding in *Lowenfield* v. *Phelps, supra,* 817 F.2d 285, correctly expresses the applicable due process princi-

ples under the federal Constitution. As for defendant's suggestion that we adopt a different rule under the California Constitution, we believe that sound practical and policy considerations support *Lowenfield*.

In determining the propriety of a particular proof allocation, a critical factor is the extent to which either party has access to the relevant information. As stated in *Morrison v. California* (1934) 291 U.S. 82, 89 [78 L.Ed. 664, 669-679, 54 S.Ct. 281], due process generally allows shifting to the defendant the burden of proving his affirmative defenses if, "upon a balancing of convenience or of the opportunities for knowledge," the burden shift does not subject the defendant to hardship or oppression. (See also *Harris v. Irish Truck Lines, Inc.* (1974) 11 Cal.3d 373, 378 [113 Cal.Rptr. 489, 521 P.2d 481]; 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 137-138, pp. 119-121 [citing cases stressing importance of one party's knowledge or access thereto in allocating proof burden].)

Applying this principle to the present case, one might reasonably expect that the defendant and his counsel would have better access than the People to the facts relevant to the court's competency inquiry. Indeed, this analysis affords a satisfactory answer to *Bilyew's* (*supra*, 686 F.2d 1238) concern about the defendant's possible inability to cooperate with his counsel in establishing his incompetence: Counsel can readily attest to any such defect or disability. The People, on the other hand, have little or no access to information regarding the defendant's relationship with his counsel, or the defendant's actual comprehension of the nature of the criminal proceedings.

In addition to asserting the invalidity of the proof allocation in section 1369, defendant also challenges the presumption of competence set forth therein. According to defendant, it is irrational to preserve that presumption *after* a doubt arises regarding defendant's competence. We believe the issue is controlled by the cases and analysis previously set forth regarding the allocation of the proof burden. The primary significance of the presumption of competence is to place on the defendant (or the People, if they contest his competence) the burden of rebutting it. By its terms, the presumption of competence is one which affects the burden of proof and, accordingly, it remains in effect despite the introduction of some evidence of incompetence. (See Evid. Code, §§ 500, 550, 603-605.) We decline to hold as a matter of due process that such a presumption must be treated as a mere presumption affecting the burden of production, which disappears merely because a preliminary, often undefined and indefinite, "doubt" has arisen that justifies further inquiry into the matter.

We conclude that section 1369 passes constitutional muster under both the federal and state Constitutions. Accordingly, we need not address the

People's alternative contention that any error in the proof allocation was harmless in light of the "clear evidence" of defendant's competence. (Compare *Lowenfield* v. *Phelps, supra,* 817 F.2d at p. 295, with *Bilyew, supra,* 686 F.2d at p. 1245.)

B. *Improper Opinion Testimony*

█ Next, defendant contends the court erred in permitting the prosecutor, over objection, to elicit an opinion from a nonexpert witness regarding defendant's mental state and degree of awareness while in jail. The point lacks merit.

As previously indicated, at the competency hearing both parties elicited expert and nonexpert testimony regarding defendant's state of mind. Thus, in addition to psychiatric experts, the People called J. D. Green, a deputy sheriff, who testified that he conversed with defendant in 1986 at the Orange County jail following his arrest. The conversation concerned defendant's "housing" situation, and his need for protective custody. According to Deputy Green, he was able to communicate with defendant, who understood the conversation and was "very responsive" and "very descriptive" in discussing his housing problem.

In addition to Deputy Green and several psychiatric experts, the People called Richard Negrette, defendant's former parole officer, who testified (over defendant's objection) that defendant acted rationally during their conversations in 1984. Defendant likewise called some lay persons to testify regarding his incompetence, including his sister and a defense investigator, each of whom related defendant's difficulty in conducting a rational conversation.

Defendant argues that because the sole issue at the competency hearing concerned his ability to understand the nature of the criminal proceedings and to assist his counsel (see § 1367), Deputy Green's nonexpert opinion regarding defendant's state of mind was irrelevant and inadmissible. Defendant observes that Green's many years of law enforcement experience did not qualify him as an expert in judging a suspect's state of mind. (See *People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240]; *People* v. *Sergill* (1982) 138 Cal.App.3d 34, 39-40 [187 Cal.Rptr. 497] [inadmissible police testimony regarding defendant's character and veracity]; Evid. Code, § 720, subd. (a).) Defendant also asserts that Green was unqualified to express an opinion as a *lay* witness. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741] [inadmissible lay opinion regarding defendant's veracity].)

The People concede that Deputy Green was not an expert qualified to state an opinion regarding defendant's state of mind, but they argue he was adequately qualified to state a lay opinion as to whether defendant understood what Green was saying. (See Evid. Code, § 800; *People* v. *Farmer* (1989) 47 Cal.3d 888, 908 [254 Cal.Rptr. 508, 765 P.2d 940] [discretionary to admit lay opinion testimony].) The People observe that, unlike *Melton* and *Sergill*, both *supra*, Deputy Green was not asked his opinion regarding defendant's *veracity*, but simply whether defendant appeared to understand their conversation.

In light of the discretion vested in the trial court to permit lay opinion testimony, the nature of the other evidence admitted at the competency hearing, and the rather limited responses elicited from Deputy Green, we see no error. Similar testimony from police or jail personnel regarding the defendant's apparent mental state has been admitted in at least one other capital case (see *People* v. *Ghent* (1987) 43 Cal.3d 739, 752 [239 Cal.Rptr. 82, 739 P.2d 1250] [testimony of interrogating officer that defendant did not seem disoriented]; cf. Evid. Code, § 870, subd. (c) [opinion of person's "sanity"]), and the challenged testimony appears reasonably relevant to the question whether a defendant is presently able to communicate with his counsel at trial. As the trial court acknowledged in this case, objections to such lay testimony relate more to weight than to admissibility.

## C. *Evidence of Defendant's Prior Crimes and Convictions*

█ Next, defendant asserts the prosecutor, during the competency hearing, committed misconduct in presenting evidence and argument regarding defendant's prior criminal acts and convictions. Defendant observes that evidence was admitted regarding (1) his 1968 conviction for firing a shotgun in a bar, (2) his 1977 rape, kidnapping and lewd conduct convictions, (3) his status as a registered sex offender and parolee, and (4) his various violent acts committed while in custody.

Most of these matters were first elicited *without objection*, on cross-examination of defense experts, for the proper purpose of determining the facts on which they based their opinions regarding defendant's incompetence. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 31-32 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836].) Defendant maintains, however, that the prosecutor should not have made further reference to these matters (which remained largely unproved or without proper foundation) in his closing arguments. Defendant observes he made proper objection to these arguments. (See *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) He contends the prosecutor's remarks "placed undue emphasis on [his] violent back-

ground," thereby shifting the focus of the hearing from competency to "propensity to commit 'bad' acts . . . ."

We have reviewed the record and find no misconduct. The prosecutor simply outlined the competency hearing testimony and the facts on which that testimony was based, including occasional references to defendant's prior acts and convictions. Throughout his argument, the prosecutor explained to the jurors that his comments were not evidence, that the sole issue then before them was defendant's competence and not his guilt of any crimes, and that any evidence of such crimes was introduced for the sole purpose of determining the competency issue and not to show that defendant was "a bad guy."

The trial court similarly instructed the jury that the prosecutor's comments were not evidence, and that any evidence introduced for a limited purpose, including the exhibits containing references to defendant's prior criminal record, should be considered only for that purpose.

We conclude the jury's competency finding should be upheld.

### III. GUILT PHASE CONTENTIONS

#### A. *Failure to Discharge Venire*

■ Defendant argues the court erred in failing to discharge the entire jury venire after learning that some prospective jurors indicated they were biased against defendant. Prospective juror Sturgeon stated on voir dire that she had heard her fellow venirepersons make statements such as "even his own lawyers think he's guilty," and "they ought to have [*sic*] him and get it over with."

At defendant's request, the court held a hearing on the matter. On further examination, Sturgeon asserted that at least five prospective jurors had made such remarks, and she identified some persons whom she believed had either made such comments or had overheard them being made. Prospective juror Durling confirmed that he and a few other venirepersons, while in the court elevator, had made statements such as "in frontier justice style," the authorities should "bring the guilty S.O.B. in, we'll give him a trial, and then hang him." Prospective juror Clasen stated he had heard similar comments from other venirepersons.

Defendant thereupon moved to discharge the entire venire, on the ground that it had become tainted and further inquiry would only aggravate the situation. The trial court denied the motion without prejudice to a renewed

motion following further voir dire. Defendant declined to conduct such voir dire, asserting it would be impossible to further explore juror bias without antagonizing the jurors and creating added bias against defendant.

The People observe that none of the prospective jurors implicated during the bias hearing actually served on defendant's jury, and each person selected for the jury affirmed his or her ability to be fair and impartial. Moreover, the People note that defendant failed to exhaust his peremptory challenges and, accordingly, cannot complain of any error in failing to exclude particular jurors. (See, e.g., *People* v. *Coleman* (1988) 46 Cal.3d 749, 770-771 [251 Cal.Rptr. 83, 759 P.2d 1260].) We question the application of the foregoing rule to situations in which the defendant complains of a failure to discharge an entire venire, for we could not expect the defendant to expend his peremptory challenges in a vain attempt to exclude every member of the venire. But, for other reasons, we think the People's basic position has merit.

We believe the trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required. Defendant cites no case, and we have found none, indicating that such a drastic remedy is appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks. Unquestionably, further investigation and more probing voir dire examination may be called for in such situations, but discharging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant. The present case falls short of that mark. We conclude the trial court did not err in declining to discharge the entire venire.

### B. *The Adoptive Admissions Rule*

Shortly after defendant's arrest, his sister Sylvia Ayala visited him in jail. She asked him, "why did you have to shoot those three poor boys?" Defendant initially made no response. After embracing his sister, he later indicated he did not wish to talk about the matter. Soon thereafter, however, defendant told his sister that "every dog has his day, every cat has his night," and he mentioned the Bible and the Book of Revelations.

Over defendant's hearsay objection, the trial court admitted evidence of the foregoing conversation, ruling that defendant's initial silence in response to his sister's inquiry was admissible as a possible adoptive admission should the jury so find. (See Evid. Code, § 1221 [statement by another may be deemed adopted by party's "words or other conduct"]; *People* v.

*Silva* (1988) 45 Cal.3d 604, 623-625 [247 Cal.Rptr. 573, 754 P.2d 1070].) Defendant, relying on self-incrimination and due process principles derived from the Fifth and Fourteenth Amendments to the United States Constitution, now contends that the premise underlying the adoptive admissions rule (namely, that silence in the face of an accusatory statement may constitute an admission of guilt) is invalid and irrational. According to defendant, the rule "unconstitutionally penalizes constitutionally-protected conduct," i.e., the right to remain silent following arrest.

Defendant cites authorities suggesting that in the criminal context, it is unreasonable to expect the accused to respond to an accusation of guilt. (E.g., Gamble, *The Tacit Admissions Rule: Unreliable and Unconstitutional* (1979) 14 Ga.L.Rev. 27; *Commonwealth* v. *Vallone* (1943) 347 Pa. 419 [32 A.2d 889, 892] [dis. opn.].) Indeed, once *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) warnings have been given, it may be constitutionally improper to introduce evidence of an accused's postarrest silence. (See *Fletcher* v. *Weir* (1982) 455 U.S. 603, 605-607 [71 L.Ed.2d 490, 493-494, 102 S.Ct. 1309]; *Doyle* v. *Ohio* (1976) 426 U.S. 610, 619 [49 L.Ed.2d 91, 98, 96 S.Ct. 2240].) The record fails to show that defendant was given *Miranda* warnings prior to his conversation with his sister. Although the record contains a bare assertion to that effect from trial counsel, the record is otherwise silent on the matter, and it seems doubtful that counsel had personal knowledge of the facts as he was not present during the interrogation.

Appellate counsel now asks us to take judicial notice of a purported police report and related transcript of a police interrogation with defendant in which such warnings were given, but counsel has made no attempt to authenticate or certify either the report or the transcript. (See *Goshgarian* v. *George* (1984) 161 Cal.App.3d 1214, 1225 [208 Cal.Rptr. 321]; *People* v. *Preslie* (1977) 70 Cal.App.3d 486, 494-495 [138 Cal.Rptr. 828]; cf. *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5, 10, fn. 3 [219 Cal.Rptr. 13, 706 P.2d 1146].) Accordingly, the motion is denied.

But even if we assume for purposes of argument that such warnings were given here, in the context of the present case, where defendant was engaged in conversation with his own sister, it was not unreasonable to permit the jury to draw an adverse inference from his silence in response to her inquiry as to why he shot the victims.

The record does not suggest that defendant believed his conversation with his sister was being monitored, or that his silence was intended as an invocation of any constitutional right. Defendant's conversation with his

sister apparently was not monitored, for the officers learned of Mrs. Ayala's accusation and defendant's response when she talked to them after the interview. We are not here concerned with, and do not address, the situation in which an in-custody, *Mirandized*, suspect is confronted with an accusatory statement in circumstances where he may be presumed to suspect the monitoring of his conversation. We do not decide whether, in such circumstances, application of the adoptive admissions rule would be unfair, essentially requiring the defendant to respond to avoid an adverse inference of guilt if he remains silent.

■ As we recently explained, "to warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide. [Citation.]" (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1011 [254 Cal.Rptr. 586, 766 P.2d 1].) In the present case, the jury was not directed to draw an inference of guilt, but was merely told (CALJIC No. 2.71.5) that defendant's silence "may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

In *People* v. *Silva, supra,* 45 Cal.3d at page 624, where a similar instruction was given, we observed that if a defendant remains silent in the face of an accusatory statement from a person *other* than a police officer, his silence " 'lead[s] reasonably to the inference that he believes the accusatory statement to be true.' . . . Here, defendant [Silva] heard Shelton describe the circumstances surrounding Kevin's murder . . . and smiled without protesting or denying Shelton's description . . . . This evidence was sufficiently relevant to be submitted to the jury under appropriate instructions." (Quoting from 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 3.3, p. 175.)

■ In sum, although as previously indicated the use of the adoptive admissions rule may be unwarranted in some situations, including some custodial interrogations, we see no valid constitutional objection to its application in cases where the defendant reasonably could be expected to respond to, and deny, the accusatory statement. (See also *Silva, supra,* 45 Cal.3d at pp. 623-625.) Thus, we reject defendant's broad constitutional challenge to the adoptive admissions rule.

## C. *Ayala's Police Agent Status*

In a related argument, defendant contends the trial court erred in failing to afford him the opportunity to demonstrate that his sister, Silvia Ayala, was acting as a police agent at the time she met with him in jail, as previously discussed. The point lacks merit.

At the foundational hearing aimed at determining the admissibility of evidence of defendant's adoptive admission, evidence was adduced indicating that Mrs. Ayala had previously been told by police officers of the charges against defendant, and that she was allowed by the officers to visit him in private. Although Mrs. Ayala was not asked by the police to discuss the charges with defendant, she was interrogated by a police investigator immediately *following* her visit. As previously indicated, Mrs. Ayala related defendant's conduct and statements to the officers.

Defense counsel, evidently hoping to establish that the officers were giving Mrs. Ayala special treatment, asked her whether they had informed her of the jail policy to allow defendant no visitors other than an attorney or bondsman. The prosecutor's hearsay objection was sustained. Defendant did not call police personnel to directly establish jail visitation policy, or to determine whether the officers informed Mrs. Ayala regarding such policy. Nor did defendant ask the officers about her possible status as a police agent.

Defendant now complains he was improperly foreclosed from attempting to establish Mrs. Ayala's police agent status by showing that she been given special visitation privileges in return for eliciting inculpatory statements from her brother. (See, e.g., *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436, 459 [91 L.Ed.2d 364, 384-385, 106 S.Ct. 2616]; *Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682].)

None of the police agent cases cited by defendant indicates that it would have been improper for the officers to grant an inmate's relatives special visitation privileges in the *unspoken* hope that they might elicit statements from defendant and inform the officers thereof. (See *Arizona* v. *Mauro* (1987) 481 U.S. 520, 529 [95 L.Ed.2d 458, 468, 107 S.Ct. 1931].) In any event, it is apparent that defendant had ample opportunity to explore the issue through his own examination of the police officers, yet he failed to do so. The People's successful hearsay objection certainly did not preclude such alternate methods of inquiry.

Defendant suggests his trial counsel may have been incompetent in failing to pursue such further inquiry. Yet it is entirely possible counsel

tactically declined to pursue the matter, doubting he could establish that defendant's sister was an agent of the government and acting against his best interests. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Moreover, to establish grounds for relief based on incompetence of counsel, defendant must show a reasonable probability that, but for counsel's omissions, the verdict would have been different. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].) No such showing is made here. Defendant has not demonstrated that further inquiry would have established Mrs. Ayala's status as a police agent, or that as a consequence defendant's adoptive admission would have been excluded. Thus, we have no basis for concluding counsel's omission prejudiced defendant's case.

### D. *Failure to Preserve Evidence*

The officers investigating the murder of Douglas Metal found a Perrier bottle lying atop a freezer at the dairy where he worked. Officer Barnes took one fingerprint from the bottle, but inadvertently failed to retain the bottle itself, which was lost or destroyed. At trial, the print was identified by a prosecution expert as matching defendant's prints; a defense expert disputed the identification. Both prosecution and defense experts agreed, however, that the print bore two unexplained "points of dissimilarity."

Defendant moved to exclude the print evidence based on the People's failure to preserve the bottle. The trial court denied the motion on the basis that exclusion of evidence for failure to preserve other evidence is appropriate only if the exculpatory value of the lost evidence was apparent to the police *before* its loss. (*California* v. *Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 421-422, 104 S.Ct. 2528]; see *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1233-1234 [255 Cal.Rptr. 569, 767 P.2d 1047] [adopting *Trombetta* rule].) In *Johnson*, the defendant similarly argued that inculpatory fingerprint evidence should have been excluded because the People improperly failed to preserve a catalog bearing those prints. We rejected the argument because the catalog "did not have an exculpatory value that was obvious at the time of the test . . . ." (47 Cal.3d at p. 1235.) Here, of course, the investigating officer likewise could not know at the time the prints were taken whether, or to what extent, the Perrier bottle's print matched defendant's prints.

■ Defendant now argues the court should have instructed the jury sua sponte that, because of the police officer's negligent failure to preserve the bottle, the jury should draw any conflicting inferences regarding the prints

in favor of defendant. (See *Arizona* v. *Youngblood* (1988) 488 U.S. 51, 54-55 [102 L.Ed.2d 281, 287, 109 S.Ct. 333] [similar instruction given by trial court].) In addition, defendant would require a sua sponte instruction that, by reason of their failure to preserve the bottle, the People's fingerprint evidence should be viewed with "distrust." We reject both contentions.

Once the defendant has proved a loss of material evidence, the trial court has discretion to impose appropriate sanctions, including fashioning a suitable cautionary instruction. (See *People* v. *Zamora* (1980) 28 Cal.3d 88, 99-103 [167 Cal.Rptr. 573, 615 P.2d 1361]; *People* v. *Gonzales* (1989) 209 Cal.App.3d 1228, 1233, 1234 [257 Cal.Rptr. 828].) But neither *Trombetta* nor *Youngblood* held that instructions such as those proposed by defendant are required sua sponte, and we are reluctant to impose such an instructional sanction for mere negligence in failing to preserve evidence whose exculpatory value was unapparent to the officers when their omission occurred. *Youngblood* held that the defendant must show the police acted in "bad faith" in order to demonstrate a due process violation based on the failure to preserve potentially useful evidence. (488 U.S. at p. 51 [102 L.Ed.2d at p. 289].) The court merely noted in passing that the trial court gave the instruction cited by defendant herein. (*Id.*, at p. 287.)

The Courts of Appeal have uniformly rejected claims of error grounded on the failure to give similar instructions. (See *People* v. *Huston* (1989) 210 Cal.App.3d 192, 212-215, & fn. 5 [258 Cal.Rptr. 393]; *People* v. *Gonzales, supra,* 209 Cal.App.3d 1228, 1233-1234; *People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1218 [255 Cal.Rptr. 691].) None of these cases indicates any basis for a sua sponte instruction of the kind given in *Youngblood*, if no bad faith failure to preserve exculpatory evidence is involved. We conclude that, under the circumstances of this case, the trial court did not err in failing to instruct sua sponte that any conflicting inferences should be drawn in defendant's favor, or that the People's evidence should be viewed with distrust.

### E. *Prosecutorial Misconduct*

1. *Attack on Expert Testimony*—Defendant contends the prosecutor improperly mounted a personal attack on Lee Smith, one of the defense experts. Smith, who was qualified as a fingerprint expert, testified that the print on the Perrier bottle did not match defendant's prints. (As previously indicated, a People's expert disagreed.) In his closing guilt phase arguments, the prosecutor accused Smith (among other things) of "prostituting" the judicial system, of "selling out," and of earning "a thousand dollars on this case." According to the prosecutor, Smith was "motivated solely by greed" and was "dishonest." The prosecutor reviewed evidence disclosing that

Smith had participated as a paid expert in several prior criminal trials in which his prodefense opinions were challenged and ultimately rejected.

 Defendant maintains the prosecutor's attack on Smith exceeded the proper bounds of fair comment on an expert's credentials or credibility. Although the prosecutor was entitled to point out that Smith was a paid expert and to otherwise question his competency or credibility based on evidence in the record (see Evid. Code, §§ 722, subd. (b), 721, subd. (a); *People* v. *Washington* (1969) 71 Cal.2d 1061, 1086 [80 Cal.Rptr. 567, 458 P.2d 479]), defendant submits that the accusations of "prostitution," dishonesty and greed were unnecessary and excessive (see *People* v. *McGreen* (1980) 107 Cal.App.3d 504, 514-519 [166 Cal.Rptr. 360] [prosecutor accused defense expert of selling his credentials, and being a "habitual and chronic liar"]).

We need not decide whether the prosecutor's remarks exceeded fair comment on the evidence elicited at trial, because defendant failed to object to the foregoing comments or seek an appropriate admonition, and must be deemed to have waived his objection. (See *People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1030; *People* v. *Green, supra,* 27 Cal.3d 1, 27.) Although defendant suggests the misconduct was so pervasive and offensive that an admonition would have been useless (see *McGreen, supra,* 107 Cal.App.3d at p. 519), a timely objection and admonition by the court at the outset might have tempered the prosecutor's aggressiveness *before* it became so extreme. That being so, it seems reasonable to place on defendant the burden of making a timely objection.

We likewise reject defendant's assertion that counsel's failure to object may have reflected his incompetence. As we have previously noted herein, to obtain relief on incompetent counsel grounds, defendant must show a reasonable probability that his counsel's omission affected the verdict. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 647, 697-698].) We have no sound basis for reaching such a conclusion here.

2. *Comments on Defendant's Courtroom Behavior*—On two separate occasions during the guilt phase, the prosecutor commented on defendant's nontestimonial conduct. First, during the prosecutor's examination of defendant's sister regarding a tape recording of an interview with police officers, defendant evidently began laughing, prompting the prosecutor to observe that "the defendant apparently thinks [the tape recording is] funny." The court admonished the prosecutor and defendant not to engage in further "colloquy," and defendant remarked, "Can't help it, your honor."

The second occasion arose when the prosecutor in closing argument characterized defendant as "a cold calculating, cowardly killer," who

placed his victims on the ground before executing them. Defendant interrupted the argument by stating, "I think you are chickenshit," and the prosecutor thereupon replied, "He can do it right now; he can mouth off right now because he knows there's nothing going to happen. He's all secure over there right now, and he doesn't have the guts to face what's [*sic*] he's doing here. And that's why he has to mouth off." Although defense counsel told defendant to "stop it" after his interjection was made, counsel made no objection to the prosecutor's response.

■■■ Defendant, observing that he elected not to testify at trial, contends the prosecutor committed misconduct in commenting on his "demeanor." (See *People* v. *Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629] [general rule prohibiting comment on nontestifying defendant's courtroom behavior]; *People* v. *Garcia* (1984) 160 Cal.App.3d 82, 93 [206 Cal.Rptr. 468] [prosecutor's improper comment on defendant's "snickering" at witness's testimony]; *United States* v. *Schuler* (9th Cir. 1987) 813 F.2d 978, 979-980 [comment on nontestifying defendant's laughter during testimony].)

First, we note that defendant failed to object to the prosecutor's comments, or seek an admonition, and accordingly any claim of error was waived. (*People* v. *Green, supra,* 27 Cal.3d 1, 27; see *People* v. *Gilliam* (1974) 41 Cal.App.3d 181, 194-195 [116 Cal.Rptr. 317] [failure to object to prosecutor's comments on defendant's smiling during prosecutor's argument].) Second, the prosecutor's brief comment on defendant's laughter was so minor as to be entirely harmless. The jury was not asked to draw any adverse inferences of guilt from defendant's conduct.

Finally, although the prosecutor's subsequent comments were somewhat more serious, incorporating defendant's "chickenshit" remark into the prosecutor's theme of defendant's cowardice and cruelty, in context, the prosecutor was simply reacting spontaneously to defendant's gratuitous interruption of the proceedings, rather than commenting reflectively on his demeanor. Under the circumstances, any misconduct was harmless. The evidence of defendant's guilt was substantial; no defense was offered other than an attempt to dispute the fingerprint evidence tying him to *one* of the three murders. As in *Garcia, supra,* 160 Cal.App.3d at page 95, and *Gilliam, supra,* 41 Cal.App.3d at pages 194-195, we conclude that any prosecutorial misconduct in the present case was likewise nonprejudicial. It was not reasonably probable that a more favorable result would have occurred had the prosecutor's comments not been made. (See *Garcia*, at p. 93, & fn. 12.) In addition, we do not find it reasonably possible the asserted misconduct affected the jury's penalty deliberations.

## F. *Shackling Defendant*

■ Before trial, the prosecutor moved to shackle defendant, based on his prior record and history of violence, including a long list of disturbances and assaults while in custody. (Defendant was muscular, weighed over two hundred and thirty pounds and was around six feet three inches tall.) The prosecutor agreed, however, to allow defendant to remain unshackled as long as he behaved properly; defendant was so advised and he stated he understood. Nonetheless, during the competency phase testimony, he suddenly cried out, stood up and turned over the counsel table. Accordingly, the court ordered defendant shackled for the remainder of the trial, despite defendant's subsequent promise to behave. (On one occasion, defendant objected to being photographed, stating that if he were not "chained up" he would have thrown his chair at the photographer.)

Defendant first contends that the court abused its discretion in ordering him shackled without considering less drastic measures of maintaining security. He observes that the applicable authorities have characterized shackling as a "last resort" to be used where a manifest need therefor arises and no lesser measures would suffice. (See *Illinois* v. *Allen* (1970) 397 U.S. 337, 343-344 [25 L.Ed.2d 353, 358-359, 90 S.Ct. 1057]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1261-1265 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Duran* (1976) 16 Cal.3d 282, 290 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].)

Defendant recognizes that recent cases of this court have upheld shackling in similar situations involving defendants who have a prior record of violence or who have displayed violent behavior in the courtroom. (E.g., *People* v. *Sheldon* (1989) 48 Cal.3d 935, 945-946 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Hamilton* (1985) 41 Cal.3d 408, 423-424 [221 Cal.Rptr. 902, 710 P.2d 981].) Based on our holdings in those cases, we find no abuse of discretion here, where the record on its face demonstrated a manifest need to shackle defendant following his violent behavior.

■ Defendant also complains of the court's failure to instruct the jury, sua sponte, that the restraints "should have no bearing on the determination of the defendant's guilt." (*Duran, supra,* 16 Cal.3d at pp. 291-292.) *Duran* required such an instruction in cases in which the restraints were visible to the jury prior to its *guilt* determination. (*Ibid.*) Here, as the People point out, although there are indications that some *prospective* jurors noticed defendant's shackles during voir dire examination, nothing in the record indicates the shackles were visible to the jury which determined his guilt. Although defendant testified during the *sanity* phase, and we may infer that

his shackles were then viewed by the jury, the risk of substantial prejudice to a shackled defendant is diminished once his guilt has been determined.

Even assuming the court erred in failing to frame an instruction on shackling, the error was not prejudicial. In *Duran*, our reversal of the judgment was based on a combination of errors in a close case, including improper exclusion of evidence, restrictive cross-examination, and the shackling of a defendant who elected to testify at the guilt phase. As we noted in *Duran*, the defendant's visible wrist and ankle restraints could have damaged his credibility as a witness. (16 Cal.3d at p. 296.)

In the present case, defendant did not testify at the guilt phase, and the failure to admonish the jury to ignore his shackles was unaccompanied by other substantial errors. We conclude that any error in failing to instruct more directly on the shackling issue was harmless. (See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1084-1085 [248 Cal.Rptr. 510, 755 P.2d 960].)

G. *Use of Mannequins*

■ Defendant next contends the court erred in allowing the prosecution to display three life-size mannequins throughout the course of the trial. These mannequins were designed with rods sticking through them to show the bullet trajectories as to the three murder victims, some of whom may have been executed while in a helpless position. In addition, the prosecution placed one victim's bloodstained shirt on a mannequin for similar display purposes.

The mannequins were formally entered in evidence at the guilt phase, remained in the courtroom (over defendant's objection) during the guilt phase and the penalty phase arguments and, along with the other exhibits, accompanied the jury into the jury room during penalty phase deliberations. Defendant complains that the "brooding omnipresence" of these "constant accusers" could only have prejudiced him. As the People observe, however, the mannequins were properly admitted in evidence as part of the case-in-chief (see *People* v. *Brown* (1988) 46 Cal.3d 432, 442-443 [250 Cal.Rptr. 604, 758 P.2d 1135]), and the trial court took reasonable steps to minimize any prejudicial effect on the jurors.

After defendant objected to the continued presence of the mannequins in the courtroom, the trial court ordered them placed so that they would not face the jury. In addition, they were removed from the jury's view during the sanity phase and most of the penalty phase. Thereafter, when defendant objected to their presence in the jury deliberation room, the court observed that, having been admitted in evidence, the mannequins properly should be

made accessible to the jury during deliberations. The court believed it might be more prejudicial to defendant to treat the mannequins differently from the other items of physical evidence, and thereby call the jury's further attention to them. The court noted that the mannequins were less objectionable than the photographs originally proposed by the People to illustrate the victims' wounds.

In sum, it is apparent the court carefully exercised its discretion in the matter with a view toward accommodating the respective interests of both parties. Although the court reasonably could have excluded the mannequins from the jury room, we find no abuse of discretion in the court's contrary ruling. (See *People* v. *Brown, supra,* 46 Cal.3d at p. 443.) The trial court was in a far better position than we to assess the potential prejudice arising from the display of such physical evidence.

### H. *Reinstatement of Withdrawn Insanity Plea*

Defendant originally entered pleas of not guilty and not guilty by reason of insanity. After the competency and guilt phases, defendant successfully moved to withdraw the insanity plea. Two days later, however, defense counsel announced that defendant personally wished to reinstate his insanity plea. Counsel stated his own opinion that his client's decision was tactically unsound, because none of the psychiatrists had testified defendant was legally insane, and a sanity hearing would require him to expose his remaining psychiatric evidence, leaving nothing in reserve for the penalty phase.

The court agreed with counsel's assessment but evidently believed it had no option to deny the motion on purely tactical grounds in view of defendant's personal request. The court thereupon examined defendant, confirmed that reinstatement of the plea was defendant's free and voluntary choice, and ultimately accepted the change of plea. (Defendant explained that he had been taking medication and had been "confused" at the time he withdrew his insanity plea.)

Defendant now asserts the trial court erred in failing to exercise discretion in deciding whether to accept the withdrawn plea. As defendant observes, although the original choice of plea is left to the accused (§§ 1016, 1018), once a plea has been entered the court has discretion to refuse to allow him to withdraw that plea or enter a new plea. (§ 1016; see *People* v. *Cartwright* (1979) 98 Cal.App.3d 369, 386 [159 Cal.Rptr. 543].) But we think defendant is in no position to complain on appeal of the trial court's order *granting* his request to reinstate his withdrawn plea.

Initially, we observe that prior cases generally have stressed that the decision to plead, or to change or withdraw a plea, is a matter lying within

the defendant's, rather than his counsel's, ultimate control, regardless of tactical considerations. (See *People* v. *Gauze* (1975) 15 Cal.3d 709, 717 [125 Cal.Rptr. 773, 542 P.2d 1365] [defendant's personal right to refuse to enter insanity plea]; *People* v. *Rogers* (1961) 56 Cal.2d 301, 305 [14 Cal.Rptr. 660, 363 P.2d 892] [counsel's improper withdrawal of not guilty plea and entry of guilty plea to lesser offense]; *People* v. *Redmond* (1971) 16 Cal.App.3d 931, 938 [94 Cal.Rptr. 543] [defendant's qualified right to withdraw insanity plea].)

As we noted in *Gauze, supra,* 15 Cal.3d 709, under the rule in *Redmond, supra,* "a presently sane defendant may withdraw an insanity plea, provided the court is satisfied that the defendant is making a free and voluntary choice with adequate comprehension of the consequences. [Citations.] If a defendant may withdraw an insanity plea, certainly he cannot be compelled to present such a plea . . . . [¶] [He] made a free and voluntary choice with knowledge of its consequences. Neither counsel nor the court had the power to contravene that choice." (15 Cal.3d at pp. 717-718; cf. *People* v. *Frierson* (1985) 39 Cal.3d 803, 813-818 [218 Cal.Rptr. 73, 705 P.2d 396] [defendant's "fundamental right" to present diminished capacity defense].)

By analogy to *Gauze,* if a defendant cannot be compelled by counsel to present an insanity defense, he cannot be compelled by counsel to abandon one merely because counsel disagrees with the tactics of that decision. Thus, contrary to defendant's present premise, the trial court had no discretion to deny defendant's motion to reinstate his insanity plea solely because his counsel opposed that choice on tactical grounds. We conclude the court did not err in granting defendant's free and voluntary decision to reinstate his previously withdrawn insanity plea.

I. *Failure to Clarify Instructions*

At the sanity hearing, some expert testimony indicated defendant may have been a paranoid schizophrenic, while other experts characterized him as a sociopath. During the jury's deliberations as to defendant's sanity, the jury requested clarification regarding the basic definition of insanity, and the trial court correctly reread the appropriate instructions based on our decision in *People* v. *Skinner* (1985) 39 Cal.3d 765, 768-769 [217 Cal.Rptr. 685, 704 P.2d 752] (insanity constitutes inability, *resulting from mental illness,* to know nature of one's act or to know whether it was right or wrong). The jury foreman then asked whether paranoid schizophrenia was "the true definition of mental illness," and whether "the term 'sociopath' or 'antisocial personality' is not really a true mental illness?"

After consulting with counsel, and with their approval, the court advised the jury that the court could not directly answer the inquiry, and that the jury should decide the matter on the basis of the evidence in the case.

■ Defendant now complains the court's response was inadequate because the jury could have been left with the false impression that conditions other than schizophrenia could not be considered mental illness. Defendant observes that the jury's inquiry was more in the nature of a question of law rather than fact, and that a mere review of the evidence would not inform the jury whether "mental illness" for purposes of the insanity test included conditions other than schizophrenia. According to defendant, the court should have explained to the jury that any of the mental illnesses suffered by him could satisfy the insanity standard.

The court's insanity instructions did not limit "mental illness" to schizophrenia, but allowed the jury to consider any "evidence of [defendant's] mental condition before or after the crimes." The instructions stated further that not every form of mental illness constitutes insanity, and that "if you find the defendant was suffering from a mental illness that prevented him from knowing that his acts were morally wrong, then you must find him not guilty by reason of insanity."

Although the foregoing instructions were correct, and the court's rereading of them should have sufficed to clarify the matter, it is also true that the court could have been more explicit in responding to the jury's inquiry. For example, the court might have advised the jury that "mental illness" includes all mental conditions which produce the requisite effects. But, as explained below, it is unlikely that any such clarification would have aided defendant. (See *People* v. *Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235] [showing of prejudice required].)

As was evident from the foreman's inquiry, the jury was primarily concerned with whether a sociopathic personality could qualify as a "mental illness." A similar issue arose in *People* v. *Fields* (1983) 35 Cal.3d 329, 368-370 [197 Cal.Rptr. 803, 673 P.2d 680], where, as here, the evidence indicated the defendant was a sociopath. We held that "if the defense expert can point to no symptom, no manifestation, of defendant's condition except repeated criminal or antisocial acts, that [sociopathic] condition cannot be considered grounds for finding defendant insane. [Citation, fn. omitted]." (*Id.*, at p. 370.)

Our review of the record reveals the expert testimony outlining defendant's sociopathic personality relied essentially on his antisocial and criminal behavior. Defendant cites no expert testimony relating any additional symptoms or manifestations on which a jury might find a sociopathic mental illness of the kind qualifying for an insanity verdict under the *Fields* standard (*supra*, 35 Cal.3d 329). Thus, on the present record, the trial court's

failure to further clarify the instructions could not have prejudiced defendant.

Additionally, we note that defense counsel's approval of the court's limited response to the jury's inquiry should bar defendant from contending on appeal that a more elaborate response should have been made. If defendant desired such a response, he should have proposed it. (See *People* v. *Kageler, supra,* 32 Cal.App.3d 738, 746; cf. *People* v. *Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803] [defendant's duty to request clarifying instructions]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366] [same].) Defendant's suggestion that his counsel was incompetent in acceding to the court's response must be rejected—counsel may well have had tactical reasons for not directly raising the question whether his client's sociopathic personality in fact amounted to a bona fide mental illness under *Fields, supra,* 35 Cal.3d 329.

### J. *Defendant's Absence from Conferences and Reading of Testimony*

■ Defendant next asserts he was improperly denied the right to be personally present at various in-chambers conferences and a reading of some guilt phase testimony. (The in-chambers conferences included discussion of defendant's hostile reaction to being photographed, his potential for violence if his shackles were removed, and his self-inflicted injuries. The guilt phase testimony did not involve the three murder charges, but only the assault charge arising from the attempted robbery of victim Yoon.)

In the present case, defendant orally waived his right to be present at the various in-chambers or "bench" conferences, and at the reading of testimony. Defendant now observes that, under section 977, a *written* waiver is required if the defendant is absent "during those portions of the trial when evidence is taken before the trier of fact . . . ." Assuming the quoted language applies to the conferences and reading of testimony involved here, any error in failing to obtain a written waiver was not prejudicial.

As we stated in *People* v. *Garrison* (1989) 47 Cal.3d 746, 782 [254 Cal.Rptr. 257, 765 P.2d 419], "Although defendant's oral waiver does not comply with the writing requirement of [section 977], we find no reversible error. Defendant's absence, *even without waiver*, may be declared nonprejudicial in situations where his presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.'" (Quoting from *People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-360 [233 Cal.Rptr. 368, 729 P.2d 802] [absence from court conferences and reading of testimony deemed nonprejudicial]; see also *People* v. *Douglas* (1990) 50 Cal.3d 468, 517-519 [268 Cal.Rptr. 126, 788 P.2d 640] [absence from read-

ing of testimony nonprejudicial]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1025-1028 [264 Cal.Rptr. 386, 782 P.2d 627] [absence from jury view of murder scene, from conference regarding jury request for clarification, and from reading of testimony nonprejudicial]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1080-1081 [259 Cal.Rptr. 630, 774 P.2d 659] [absence from various hearings and conferences nonprejudicial]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 59-62 [255 Cal.Rptr. 631, 767 P.2d 1109] [absence from penalty-reduction hearing and sentencing nonprejudicial]; *People* v. *Grant* (1988) 45 Cal.3d 829, 845-846 [248 Cal.Rptr. 444, 755 P.2d 894] [written waiver]; *People* v. *Odle* (1988) 45 Cal.3d 386, 406-407 [247 Cal.Rptr. 137, 754 P.2d 184] [waiver of right to personal presence at reading of testimony; jury provided with transcript]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 585-586 [244 Cal.Rptr. 121, 749 P.2d 776] [absence from reading of testimony nonprejudicial].)

In *Garrison, Hovey,* and *Bloyd,* all *supra,* we held that the defendant had failed to carry his burden of demonstrating prejudice arising from his absence from the reading of testimony to the jury. As we stated in *Hovey,* "The rereading of testimony ordinarily would not be an event which bears a substantial relation to the defendant's opportunity to defend . . . ." (44 Cal.3d at p. 585.) Under the circumstances here, any error in procedure must be deemed harmless.

In addition, defendant fails to explain in what manner his presence at the various in-chambers conferences could have improved his opportunity to defend the charges against him. His suggestion that his mere presence at these hearings might have assisted the trial court in evaluating his competence to stand trial is entirely speculative and fails to carry his burden of proving prejudice. (See *Hovey, supra,* 44 Cal.3d at p. 585 [rejecting, as speculative, argument that jury could have been favorably influenced by watching defendant's reaction to reading of testimony].)

Defendant relies on various federal cases which he claims support a different result, but none of them requires us to adopt his position. Indeed, in several recent cases we have discussed and distinguished each of these federal cases, and we will not repeat that discussion here. (See *People* v. *Robertson, supra,* 48 Cal.3d at pp. 60-61; *People* v. *Grant, supra,* 45 Cal.3d at p. 845; *People* v. *Odle, supra,* 45 Cal.3d at pp. 406-407; *People* v. *Hovey, supra,* 44 Cal.3d at p. 585.) As the foregoing cases indicate, although some federal appellate decisions contain language to the contrary, the United States Supreme Court has never squarely held that the defendant's presence at all "critical" phases of trial is mandatory and unwaivable. Thus, assuming the proceedings at issue here should be deemed "critical," no prejudicial error occurred by reason of defendant's voluntary absence therefrom.

### K. *Counsel's Absence from Reading of Testimony*

 In a related argument, defendant complains that he was denied the assistance of counsel when his trial counsel stipulated that the assault charge testimony could be read to the jury by the court clerk without *counsel's* presence. Defendant cites no case suggesting that counsel must always attend a routine reading of earlier testimony to the jury, and our cases permit counsel discretion to waive his right to be present on such occasions. (See *People v. Lang, supra,* 49 Cal.3d at p. 1028; *People v. Bloyd, supra,* 43 Cal.3d at pp. 360-361.) No suggestion is made that actual prejudice occurred by reason of counsel's absence, such as a misreading of testimony or misconduct by the clerk, and such prejudice cannot be presumed on a silent record.

In this regard, the situation is different from that presented in *People v. Hogan* (1982) 31 Cal.3d 815, 848-850 [183 Cal.Rptr. 817, 647 P.2d 93], on which defendant relies. In *Hogan,* counsel was never informed of jury requests to see various exhibits and transcripts sent to the jurors during deliberations. Here, on the other hand, counsel was aware of the jury's request and was able to make an informed decision as to the necessity of attending the proceeding. We conclude no error occurred.

### IV. PENALTY PHASE CONTENTIONS

### A. *Victims' Character Evidence*

During the penalty phase, the prosecutor called relatives of the three robbery-murder victims to confirm that the victims were friendly, nonaggressive persons who would not have resisted a robbery attempt. For example, victim Martin's father and victim Metal's sister each testified that the respective victim had previously agreed not to resist any such attempt. The various family witnesses also identified recent "family" type photographs of the victims to show their appearance when defendant confronted them. Thereafter, in argument, the prosecutor used the photographs to argue that each victim was a "passive" type unlikely to resist a robbery. The prosecutor cautioned the jury not to use the photos to feel sympathy for the victims or their families.

 The foregoing evidence was introduced to assist in establishing, as an additional aggravating circumstance of the crime (see § 190.3, factor (a)), that the nonresisting victims may have been executed without cause or provocation. The trial court ruled that evidence of the victims' likely nonresistance was relevant to show the "state of mind of these . . . victims as to what their attitude would be if they were to be robbed." As for the photos,

the court explained that they had probative value to show "what these people look like and what [defendant] saw at the time of the killings."

Defendant argues that, despite the prosecutor's disclaimer, the "nonresistance" evidence was only marginally relevant to the penalty phase and constituted, in effect, victim impact or character evidence of the sort ruled inadmissible by the United States Supreme Court. (See *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]; *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529].) *Gathers* makes it clear that prosecutors may not exploit evidence regarding the victim's good character or background for purposes of gaining the jury's sympathy for the victim or his or her family. *Booth* precludes admission of evidence regarding the impact of the victim's death on his or her family. Both cases deemed the evidence at issue *irrelevant* to the sentencing decision and potentially prejudicial to the defendant's plea for a lesser punishment.

We recently encountered a similar contention in *People* v. *Carrera* (1989) 49 Cal.3d 291, 336 [261 Cal.Rptr. 348, 777 P.2d 121], where the victim's mother testified regarding her children's nonaggressive personalities. We first observed in *Carrera* that "*Booth* does not purport to bar generally the use of information about a murder victim at the penalty phase. The Supreme Court's concern lay mainly in the mandatory requirement that the entire victim-impact statement be admitted and in the risk that the jury's attention would be drawn to the personal qualities of the victim rather than to the blameworthiness of the defendant . . . . [T]he court took pains to note that '[s]imilar types of information may well be admissible because they relate directly to the circumstances of the crime' and that 'there may be times that the victim's personal characteristics are relevant to rebut an argument offered by the defendant.' [Citation.] *Booth* thus does not alter the standard for the admission of such evidence. (See also *South Carolina* v. *Gathers* [*supra*] 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207].) The question thus remains whether the testimony was relevant, and whether its probative value outweighed any prejudicial effect." (49 Cal.3d at p. 336.)

We concluded in *Carrera* that similar evidence of the victims' nonaggressive character was relevant to support the inference "that the victims in all likelihood did not resist the robbery and the violent, fatal attack. This in turn bore directly upon the *manner* in which defendant committed the murders, and was plainly a 'circumstance of the crime' to which fair comment could be directed." (49 Cal.3d at pp. 336-337.)

Under the principles set forth in *Carrera*, the trial court here did not err in admitting evidence of the victims' nonaggressive character traits. (See also *People* v. *Douglas, supra,* 50 Cal.3d 468, 536 ["In our view, neither

*Booth* nor *Gathers* bars comments on the crime from the victims' perspective, or brief references to the victims or their families. [Citations.]"].)

*Carrera, supra,* 49 Cal.3d 291, did not suggest, however, that family photographs would be relevant to establish the nonresisting character of the victims. Moreover, defendant points out that some family members additionally testified to such irrelevant matters as the victims' capacity for work, desire to save money or return to school, or vegetarian eating habits. Our review of the record indicates, however, that except for a few isolated references of this kind (to which no objection was made), the family members' testimony was essentially confined to the victims' probable nonresistance to being robbed.

Even if we were to conclude that the introduction of the photographs and family member testimony violated the proscriptions of *Gathers* and *Booth,* we would find beyond a reasonable doubt that any such error did not contribute to the sentencing determination. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In our view, the foregoing evidence could not have diverted the jury from its task of determining the appropriate punishment. (See *People* v. *Douglas, supra,* 50 Cal.3d at p. 537.)

### B. *Evidence of Prior Unadjudicated Crimes*

■ The prosecutor introduced evidence of four prior unadjudicated crimes as aggravating circumstances relevant to sentencing. (§ 190.3, factor (b).) These crimes included another robbery-murder (victim Martin), two assaults and a rape. Defendant contends that introduction of such evidence denied him due process and equal protection, and resulted in an unreliable sentence. He acknowledges that we rejected similar arguments in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480] [maj. opn. by Grodin, J.], but he urges us to reconsider that ruling because of the "gross superficiality" of our analysis in that case.

We have had many opportunities to reconsider *Balderas* (*supra,* 41 Cal.3d 144), but have consistently, and without a dissenting vote, declined to do so. (See, e.g., *People* v. *Robertson, supra,* 48 Cal.3d 18, 42; *People* v. *Malone, supra,* 47 Cal.3d 1, 48; *People* v. *McDowell* (1988) 46 Cal.3d 551, 569 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Hamilton* (1988) 46 Cal.3d 123, 144 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Grant, supra,* 45 Cal.3d 829, 859; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 808 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 76 [246 Cal.Rptr. 209, 753 P.2d 1]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301].) Defendant, characterizing these cases as the

"dubious progeny" of *Balderas*, and lacking in any "reasoned analysis," insists that new arguments exist to support reconsideration of that case. We disagree.

Defendant argues (1) the jury which found him guilty of the charged offenses could not be fair and unbiased in adjudging his guilt of other unadjudicated crimes at the penalty phase; (2) "other crimes" evidence is inherently prejudicial, diverting the penalty phase jury's attention from its proper task; (3) the jury cannot realistically be expected to ignore "other crimes" evidence not found true beyond a reasonable doubt; (4) some other state courts favor a rule contrary to *Balderas*; and (5) equal protection principles require treating all defendants equally, yet those who are separately prosecuted for the alleged aggravating circumstances are given rights (e.g., an impartial and unanimous jury) not available when "other crimes" evidence is merely "presented" to the penalty phase jury.

Contrary to defendant's assumption, we think *Balderas* and its progeny adequately considered and rejected the foregoing arguments. As *Balderas* observes, each of these contentions is overshadowed by the state's legitimate interest in prosecuting capital cases before a single jury, and in allowing that jury to weigh and consider the defendant's prior criminal conduct in determining penalty, so long as reasonable steps are taken to assure the defendant a fair and impartial penalty trial. (See *People* v. *Balderas, supra,* 41 Cal.3d at pp. 204-205.) We decline to reconsider that rationale here.

Defendant observes that criminal charges regarding his prior rape offense had been twice dismissed, thereby barring further prosecution (§ 1387). Defendant contends this bar likewise extended to use of the evidence as an aggravating circumstance.

In *People* v. *Heishman, supra,* 45 Cal.3d 147, 193, we explained that dismissal of charges is not the equivalent of an outright acquittal, because it is "not based on any judicial determination with respect to the truth or falsity of the charge . . . ." Similarly, we have held that evidence of offenses barred by the statute of limitations is nonetheless admissible as aggravating evidence at the penalty phase. (*People* v. *Robertson, supra,* 48 Cal.3d at pp. 43-44; *People* v. *Jennings* (1988) 46 Cal.3d 963, 981-982 [251 Cal.Rptr. 278, 760 P.2d 475].) The rationale of those cases applies here.

### C. *Extreme Mental or Emotional Disturbance*

In accordance with section 190.3, factor (d), the jury was instructed to consider "[w]hether or not the offense was committed while the

defendant was under the influence of extreme mental or emotional disturbance." (CALJIC former No. 8.84.1.) Defendant asserts that the foregoing instruction, by referring to an "extreme" condition, indicated that any "lesser disturbance" would not be a possible mitigating factor. He fears this instruction may have induced the jury to ignore the substantial evidence indicating he was suffering from some type of mental illness. We cannot agree.

First, it should be noted that the trial court also instructed the jury that it was to consider "any other circumstance which extenuates the gravity of the crime . . . ." (§ 190.3, factor (k); CALJIC former No. 8.84.1.) In *People* v. *Ghent, supra,* 43 Cal.3d 739, we concluded that this " 'catchall' provision is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (*Id.*, at p. 776.) In subsequent cases, we have reaffirmed our *Ghent* holding. (E.g., *People* v. *Hunter* (1989) 49 Cal.3d 957, 987-988 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1064 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Brown, supra,* 46 Cal.3d at pp. 457-458; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 720-721 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 297 [247 Cal.Rptr. 1, 753 P.2d 1052].)

The trial court went even further, however, and modified the factor (k) instruction to include consideration of "any sympathetic or other aspect of the defendant's character or record that the defendant proffers as a basis for a sentence less than death." (See *People* v. *Easley* (1983) 34 Cal.3d 858, 876-878, & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Moreover, the court instructed the jury that it should disregard any other conflicting instruction.

Although in closing argument the prosecutor asserted that defendant's mental state evidence did not disclose any "extreme" condition, he did not advise the jury that such evidence was wholly irrelevant to its penalty decision, and defense counsel confirmed that the evidence could be deemed a mitigating circumstance under factor (k). We conclude that the jury was properly instructed in this regard.

D. *Defendant's Mental Condition and Age as Aggravating Factors*

The court gave the standard instructions setting forth the list of aggravating and mitigating factors. (CALJIC former No. 8.84.1.) Defendant asserts the instructions were inadequate in failing to explain that certain factors, including defendant's mental condition and age, must be deemed mitigating

ones. He maintains the prosecutor improperly labelled defendant's socio-pathic condition and age (41) as aggravating factors.

■ We have held the standard instructions adequate despite their failure to identify the aggravating or mitigating character of the various sentencing factors, because such matters "should be self-evident to any reasonable person within the context of each particular case." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149]; see *People* v. *McLain* (1988) 46 Cal.3d 97, 118 [249 Cal.Rptr. 630, 757 P.2d 569].)

As for the prosecutor's remarks, no error or misconduct appears: At no time did the prosecutor argue that defendant's mental condition should be deemed an aggravating factor. Our review of the record indicates that, in context, the prosecutor was simply observing that defendant's sociopathic condition, and the resulting antisocial conduct, should not be deemed a mitigating factor. (See *People* v. *Fields, supra,* 35 Cal.3d 329, 369-370.) ■ Although he did argue that defendant's age should be deemed aggravating, that argument was interwoven with the theme that, unlike an extremely young or old person, defendant was a mature, experienced individual who made a "well-considered decision" to undertake the various crimes he committed. Such an argument is a legitimate one. (See *People* v. *Lucky, supra,* 45 Cal.3d at p. 302.)

As *Lucky* observes, the statutory word "age" "is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (45 Cal.3d at p. 302.) We decline defendant's invitation to reconsider *Lucky.* (See *People* v. *Douglas, supra,* 50 Cal.3d 468, 538-539; *People* v. *Caro, supra,* 46 Cal.3d at p. 1062; *People* v. *McLain, supra,* 46 Cal.3d at p. 111.)

E. *Lack of Findings*

■ Defendant next argues the 1978 death penalty law is unconstitutional for failure to require the jury to set forth written findings regarding the various aggravating factors it relied on in imposing death. We rejected this constitutional objection several years ago, and we discern no compelling reason for reconsidering our position now. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 178-180 [158 Cal.Rptr. 281, 599 P.2d 587]; see *People* v. *Belmontes, supra,* 45 Cal.3d at p. 805; *People* v. *Gates, supra,* 43 Cal.3d at p. 1203; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 316-317.) The federal courts have likewise declined to require such findings as a matter of

constitutional law. (*Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1195-1196, reversed and remanded on other grounds in *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871]; see *Hildwin* v. *Florida* (1989) 490 U.S. 638, 640-641 [104 L.Ed.2d 728, 731-732, 109 S.Ct. 2055] [6th Amend. does not require Florida's advisory jury to specify aggravating factors].)

Defendant, observing that other convicted felons are entitled to trial *court* findings specifying the aggravating facts which justify an increased sentence (see § 1170, subd. (c)), argues that the lack of *jury* findings in capital cases offends equal protection principles. But the defendants in these two situations are not similarly situated. Requiring the trial judge to specify his or her reasons for making an increased sentencing decision is hardly comparable to requiring 12 jurors to recite the aggravating facts which each of them believed justified a death penalty. The California death penalty law does impose on the trial court in a capital case, in ruling on the automatic motion to modify sentence (see § 190.4, subd. (e)), the obligation to specify its reasons. This section fully satisfies any legitimate equal protection demands.

### F. *Unanimity as to Uncharged Offenses*

██ Defendant next contends the court erred in failing to instruct the jury that it must unanimously find any uncharged offenses occurred beyond a reasonable doubt, before those offenses could be deemed aggravating circumstances under section 190.3, factor (b). We rejected that argument in *People* v. *Ghent, supra,* 43 Cal.3d at pages 773-774. (See also *People* v. *Johnson, supra,* 47 Cal.3d at p. 1250; *People* v. *Jennings, supra,* 46 Cal.3d at p. 988; *People* v. *Miranda* (1987) 44 Cal.3d 57, 90 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defendant urges we reconsider *Ghent, supra,* 43 Cal.3d 739. He relies on *Johnson* v. *Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981], but that case seems wholly inapposite. In *Johnson*, the penalty jury had considered a prior criminal offense *which was later set aside*. The court reversed the death judgment on the basis the jury may have relied on the invalid conviction. Nothing in *Johnson* indicated a requirement the jury unanimously agree that a particular offense was proved beyond a reasonable doubt.

As we stated in *Ghent*, "we see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proven beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty." (43 Cal.3d at p. 774.)

### G. Constitutionality of Sentencing Law

Defendant asserts various constitutional challenges to the California sentencing law and procedure; he acknowledges that our prior decisions have rejected all these challenges. (See *People* v. *Jennings, supra,* 46 Cal.3d at p. 992; *People* v. *Bonin* (1988) 46 Cal.3d 659, 698-704 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Miranda, supra,* 44 Cal.3d 57, 102-107; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 315-317; *People* v. *Frierson, supra,* 25 Cal.3d at pp. 172-188.) Defendant states no compelling reasons which might induce us to reconsider these decisions. (See also *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].)

### H. Trial Court Consideration of Victim Impact and Character Evidence

After the jury rendered its verdict, and after the trial court denied defendant's automatic motion to modify the death verdict (§ 190.4, subd. (e)), but before formal sentencing, various relatives of the victims testified regarding personal characteristics of the victims, and expressed their wish that the death sentence be imposed.

For example, victim Ariza's mother testified that her son had been a "promising and decent young man," and a "college student working to help pay his way through college." She testified that his death caused her family "untold grief, pain and suffering," and she urged that the death penalty be imposed. Ariza's father likewise attested to his suffering over his son's death, which led to his alcoholism, drunk-driving conviction, loss of family and job. Similar, though less dramatic, testimony was elicited from the relatives of victims Rea, Metal, and Martin. Before sentencing defendant, the trial court indicated it had "certainly considered" the foregoing testimony.

As we have previously noted herein in connection with a similar argument involving the jury's consideration of evidence regarding the victims' nonaggressive characters, recent decisions of the United States Supreme Court deem most "victim impact" and "victim character" evidence irrelevant to the sentencing decision and potentially prejudicial to the defendant's plea for a lesser punishment. (See *South Carolina* v. *Gathers, supra,* 490 U.S. 805 [104 L.Ed.2d 876] [prosecutor's argument regarding victim's good character]; *Booth* v. *Maryland, supra,* 482 U.S. 496 [victim impact statements].)

Neither case involves the admissibility of victim impact or character evidence at a sentencing hearing by the trial court following the jury's

verdict. (See *People* v. *Siripongs* (1988) 45 Cal.3d 548, 585-586, fn. 12 [247 Cal.Rptr. 729, 754 P.2d 1306].) Thus, we have stated that "the Eighth Amendment considerations" expressed in *Booth/Gathers* "are not implicated" in a modification hearing under section 190.4. (*People* v. *Jennings, supra,* 46 Cal.3d at pp. 994-995; see *People* v. *Lang, supra,* 49 Cal.3d at pp. 1043-1044.) Nonetheless, as we explained in *Jennings,* that section does limit the court's consideration to the evidence that was available to the jury. (46 Cal.3d at p. 994.)

■■■ As previously noted, the trial court announced its denial of the modification motion *before* hearing the family member testimony discussed above. After announcing its ruling, but before formally sentencing defendant, the court then permitted the family members to speak. Although the court indicated it had "considered" the family member testimony, it then outlined the considerable aggravating factors and evidence that it deemed supportive of a death sentence. The family victim testimony was not mentioned.

A similar situation occurred in *Siripongs, supra,* where we observed that the victim impact evidence could not have affected the trial court's ruling because the court had denied the motion before hearing the challenged testimony. (See *People* v. *Siripongs, supra,* 45 Cal.3d at pp. 585-586, fn. 12; see also *People* v. *Lang, supra,* 49 Cal.3d at p. 1044 [trial court's consideration of victim impact evidence did not affect ruling denying modification]; *People* v. *Adcox, supra,* 47 Cal.3d at p. 274 [same]; *People* v. *Jennings, supra,* 46 Cal.3d at p. 995 [same].)

As we observed in *Lang, supra,* 49 Cal.3d 991, although the trial court did state it had read and "considered" a presentence report containing the victim impact evidence, the court in ruling on the motion referred only to the evidence presented to the jury and did not indicate his decision was influenced by that report or its contents.

The situation presented here and in *Lang* is quite different from that in *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892], where the trial court in denying the automatic motion for modification of sentence expressly stated it was relying on facts found in an inadmissible probation report. In *Lewis,* the opinion orders a limited remand for another modification hearing. We conclude that under the circumstances in the present case, no such remand is required.

I. *Proportionality Review*

Defendant asserts that we should undertake a comparative "intercase" sentence review to assure that his death sentence is not disproportionate in

light of the underlying facts. We have uniformly declined to undertake such review and see no reason to reconsider our holdings. (See, e.g., *People* v. *Lang, supra,* 49 Cal.3d at p. 1045; *People* v. *Burton* (1989) 48 Cal.3d 843, 873 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Johnson, supra,* 47 Cal.3d at p. 1253.)

## V. CONCLUSION

The judgment is affirmed in its entirety.

Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

**MOSK, J.**—I dissent.

Defendant contends that the judgment must be reversed: the jury's determination that he was mentally competent cannot stand without offense to the due process clause of the Fourteenth Amendment to the United States Constitution. The majority reject the claim. After review, I am of the opinion that their analysis is erroneous and their conclusion unsound.

Prior to trial, on defense counsel's motion the court declared a doubt about defendant's mental competence and instituted proceedings on the question under the authority of the statutory scheme codified in Penal Code section 1367 and following. One of the provisions of that scheme is Penal Code section 1369, subdivision (f) (hereafter section 1369(f)), which allocates the burden of proof to the defendant: "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." The parties introduced substantial, but sharply conflicting, evidence on the issue. The jury was instructed in accordance with section 1369(f). It subsequently returned a verdict finding defendant mentally competent.

The statutory scheme on mental competence is fundamentally flawed in its allocation of the burden of proof to the defendant, and therefore cannot support the verdict returned under its "authority."

The due process clause prohibits the conviction of a person for a crime if he does not satisfy all the elements of the offense. (See, e.g., *Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 691-704 [44 L.Ed.2d 508, 514-523, 95 S.Ct. 1881].) Further, it bars conviction except on proof beyond a reasonable doubt by the prosecution of each of the elements. (E.g., *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].)

Similarly, the due process clause prohibits the conviction of a person for a crime if he is not mentally competent. (See, e.g., *Pate* v. *Robinson* (1966)

383 U.S. 375, 378 [15 L.Ed.2d 815, 818, 86 S.Ct. 836].) By parity of reasoning, it bars conviction except on proof beyond a reasonable doubt by the prosecution that the defendant is in fact mentally competent.

To be sure, the due process clause does not require the prosecution to prove the defendant sane beyond a reasonable doubt. (*Mullaney* v. *Wilbur, supra*, 421 U.S. at pp. 705-706 [44 L.Ed.2d at pp. 523-524] (conc. opn. of Rehnquist, J.) [discussing *In re Winship, supra*, 397 U.S. 358, and *Leland* v. *Oregon* (1952) 343 U.S. 790 (96 L.Ed. 1302, 72 S.Ct. 1002)].) But an insanity defense is apparently not constitutionally mandated. (*Ake* v. *Oklahoma* (1985) 470 U.S. 68, 91 [84 L.Ed.2d 53, 71, 105 S.Ct. 1087] (dis. opn. of Rehnquist, J.) [stating that "[i]t is highly doubtful that due process requires a State to make available an insanity defense to a criminal defendant"].) Further, it is an affirmative defense and as such comes into play only after the prosecution has proved the existence of all the elements of the crime charged beyond a reasonable doubt. (See *Mullaney* v. *Wilbur, supra*, 421 U.S. at pp. 705-706 [44 L.Ed.2d at pp. 523-524] (conc. opn. of Rehnquist, J.).)

The foregoing analysis, however, does not affect the conclusion that the due process clause does indeed require the prosecution to prove the defendant mentally competent beyond a reasonable doubt. Mental competence *is* in fact constitutionally mandated. Further, mental incompetence is *not* an affirmative defense that becomes operative only after proof of the crime at trial. "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." (*Drope* v. *Missouri* (1975) 420 U.S. 162, 171 [43 L.Ed.2d 103, 112-113, 95 S.Ct. 896].)

Therefore, the statutory scheme for proceedings on mental competence is fundamentally flawed in its allocation of the burden of proof to the defendant, and as a result cannot support the verdict returned under its "authority" in this case.[1]

Accordingly, I would reverse the judgment in its entirety.

**BROUSSARD, J.**—I respectfully dissent.

As the majority opinion recognizes, this case presents a significant constitutional issue that has not yet been resolved by this court or by the United

---

[1]For purposes here, I need not and do not consider the separate question of the constitutionally proper allocation of the burden *of producing evidence*. (See generally 2 ABA Standards for Criminal Justice, std. 7-4.8 (2d ed. 1986) p. 7.208; *id*., Commentary, at pp. 7.213 to 7.215.)

States Supreme Court and that has divided the lower federal courts and other state courts. The question is: When a doubt has arisen with respect to a criminal defendant's competency to stand trial, is it constitutionally permissible for a state to apply a procedural rule that presumes the defendant is competent and that places on the defendant the burden of proving that he is incompetent? (See Pen. Code, § 1369, subd. (f).)[1]

I disagree with the majority's conclusion that the challenged procedural rule is constitutional. Although the majority accurately note that "[t]he cases from other state and federal jurisdictions are in conflict on the constitutional propriety of placing on the defendant the burden of proving his own incompetence" (see maj. opn., *ante,* p. 882), the opinion fails to point out that the overwhelming majority of decisions, both federal and state, that have addressed the issue have held that in a competency proceeding it is the prosecution, rather than the defendant, that must properly bear the burden of proof on the competency issue. (See, e.g., *United States* v. *DiGilio* (3d Cir. 1976) 538 F.2d 972, 986-989; *United States* ex rel. *Bilyew* v. *Franzen* (7th Cir. 1982) 686 F.2d 1238, 1244-1245; *Brown* v. *Warden, Great Meadow Correctional Facility* (2d Cir. 1982) 682 F.2d 348, 351-354; *United States* v. *Makris* (5th Cir. 1976) 535 F.2d 899, 905-906; *People* v. *McCullum* (1977) 66 Ill.2d 306 [362 N.E.2d 307, 310-311]; *State* v. *Jones* (S.D. 1987) 406 N.W.2d 366, 367-370; *State* v. *Bertrand* (1983) 123 N.H. 719 [465 A.2d 912, 916-917]; *Diaz* v. *State* (Del. 1986) 508 A.2d 861, 863-864; *State* v. *Heger* (N.D. 1982) 326 N.W.2d 855, 857-858; *Commonwealth* v. *Crowley* (1984) 393 Mass. 393 [471 N.E.2d 353, 357-358]; *Jolley* v. *State* (1978) 282 Md. 353 [384 A.2d 91, 98]; contra *Lowenfield* v. *Phelps* (5th Cir. 1987) 817 F.2d 285, 294-295, affd. on other grounds (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546]; *State* v. *Chapman* (1986) 104 N.M. 324 [721 P.2d 392, 395]; *State* v. *Pruitt* (1984) 18 Ohio.App.3d 50 [480 N.E.2d 499, 509] (separate conc. opns. of Markus, J., and Nahra, J.); *Wallace* v. *State* (1981) 248 Ga. 255 [282 S.E.2d 325, 330]; *State* v. *Aumann* (Iowa 1978) 265 N.W.2d 316, 319-320.) While not all of the cases in the majority line are explicitly based on constitutional principles, a substantial number of the decisions clearly rest on a constitutional foundation. (See *DiGilio, supra,* 538 F.2d at p. 988; *Bilyew, supra,* 686 F.2d at pp. 1244-1245; *McCullum,*

---

[1] Penal Code section 1369 provides in relevant part: "A trial by court or jury of the question of mental competence shall proceed in the following order: . . . [¶] (f) In a jury trial, the court shall charge the jury, instructing them on all matters of law necessary for the rendering of a verdict. It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent. The verdict of the jury shall be unanimous."

Pursuant to this provision, the competency jury in the present case was instructed that "[t]he defendant is presumed to be mentally competent and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent as a result of mental disorder or developmental disability."

*supra*, 362 N.E.2d at pp. 310-311; *Jones, supra*, 406 N.W.2d at pp. 369-370; *Bertrand, supra*, 465 A.2d at p. 916.) Thus, the majority, in sustaining the constitutional validity of a statutory provision that requires a defendant to bear the burden of proving his own incompetency, have chosen to align our court with the minority of courts that have addressed the issue.

I acknowledge, of course, that our resolution of the constitutional question cannot properly be based on a head count of what other courts have done, but must rest on our own considered evaluation of the merits of defendant's constitutional claim. When the substance of the constitutional considerations underlying the out-of-state authorities is carefully analyzed, however, in my view it is clear that the opinion's conclusion cannot be sustained.

As the majority opinion recognizes, the constitutional analysis must begin with the United States Supreme Court decisions in *Pate* v. *Robinson* (1966) 383 U.S. 375 [15 L.Ed.2d 815, 822, 86 S.Ct. 836] and *Drope* v. *Missouri* (1975) 420 U.S. 162 [43 L.Ed.2d 103, 112-113, 95 S.Ct. 896]. In *Pate* and *Drope*, the United States Supreme Court established that the federal due process clause not only prohibits a state from convicting a defendant who is not legally competent to stand trial, but also requires a state to adopt and to apply procedures that are fully adequate to protect this constitutional right. (See *Pate, supra*, 383 U.S. at p. 378 [15 L.Ed.2d at p. 818]; *Drope, supra*, 420 U.S. at pp. 171-172 [43 L.Ed.2d at pp. 112-113].) The question before us is whether a state procedure that places the burden of proof at the competency hearing on the defendant properly protects this crucial right.

In *United States* v. *DiGilio, supra*, 538 F.2d 972 (hereafter *DiGilio*), the Third Circuit identified two distinct considerations that render a rule placing the burden of proof of incompetency on a defendant constitutionally impermissible. The first consideration is the basic unfairness of placing the burden of proof on a defendant whose incompetence, if actually present, will impair his ability to adequately assist in the task of meeting his burden of proof. With respect to this point, the *DiGilio* court noted that in *Pate* v. *Robinson, supra*, 383 U.S. 375, the United States Supreme Court had rejected the notion that a defendant, as to whom a question of incompetency had arisen, could waive his right to have his competency determined prior to trial. The Supreme Court reasoned in *Pate* that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." (*Pate, supra*, 383 U.S. at p. 384 [15 L.Ed.2d at p. 821].) The *DiGilio* court explained that "[i]t is equally contradictory to argue that a defendant who may be incompetent should be presumed to possess sufficient intelligence

that he will be able to adduce evidence of his incompetency which might otherwise be within his grasp." (*DiGilio, supra,* 538 F.2d at p. 988.)

The second consideration emphasized by the *DiGilio* court is that a rule that places the burden of proof on the defendant means that when the evidence on the competency issue is equally balanced, the trier of fact must resolve the issue in favor of competency, thereby subjecting a defendant to a criminal proceeding in which he faces serious sanctions even when the defendant is as likely to be incompetent as competent. As the *DiGilio* court put it: "[W]hat we are determining is a rule of law, of due process dimensions, that a defendant, about whom the evidence of competency to stand trial is in equipoise, should or should not be tried. If, as the [Supreme] Court has made clear, the concept of competency to stand trial is grounded in notions of fundamental fairness in the operation of the judicial process, see *Drope* v. *Missouri, supra,* 420 U.S. at 171-172, 95 S.Ct. 896, the question can only be answered in the negative. Evidence showing competency must be more persuasive than that showing incompetency. Of necessity, then, there is no room for a rule of law placing any burden of proof on the defendant." (*DiGilio, supra,* 538 F.2d at p. 988, fn. omitted.)

In rejecting defendant's constitutional claim in the present case, the majority opinion relies almost entirely on the fact that the United States Supreme Court, in *Leland* v. *Oregon* (1952) 343 U.S. 790, 798-799 [96 L.Ed. 1302, 1308-1309, 72 S.Ct. 1002] (hereafter *Leland*), and *Rivera* v. *Delaware* (1976) 429 U.S. 877 [50 L.Ed.2d 160, 97 S.Ct. 226] (hereafter *Rivera*), has held that it is not unconstitutional for a state to impose on a defendant the burden of proof with respect to an insanity defense. Like the minority line of decisions it follows, however, the majority opinion fails to recognize that the *Leland* and *Rivera* decisions have no bearing whatsoever on either of the two constitutional problems identified in *DiGilio, supra,* 538 F.2d 972.

To begin with, the competency issue and the insanity issue deal with a defendant's mental state at two entirely different points in time. As one commentator has explained: "[T]he issue of incompetency to stand trial must be distinguished from . . . the defense of insanity in a criminal trial, where the question is whether the defendant's mental condition *at the time of the criminal act* was such that he should not be held responsible for his conduct. The question of competency to stand trial relates rather to the appropriateness of conducting the criminal proceeding in light of the defendant's *present* inability to participate effectively." (Note, *Incompetency to Stand Trial* (1967) 81 Harv.L.Rev. 454, italics added.)

In the insanity context, a rule placing the burden of proof of insanity on the defendant imposes that burden on a defendant who, by necessity, must

have already been found to be presently competent to assist in his own defense. When a defendant is presently competent, there may be no greater unfairness in placing the burden on the defendant to prove that he was insane at the time of the offense than there is in requiring such a defendant to bear the burden of proof with regard to other affirmative defenses.

In the competency context, by contrast, the defendant's present ability to understand the proceeding and assist his counsel is the very matter in doubt, raising the fundamental problem of the potential unfairness of a rule that requires an incompetent defendant to shoulder the burden of proof on the crucial question of competency. Thus, the Supreme Court's decisions in *Leland, supra,* 343 U.S. 790, and *Rivera, supra,* 429 U.S. 877, holding that it is constitutionally permissible to place on a presently competent defendant the burden of establishing an insanity defense, provide no logical or legal support for the proposition that it is constitutionally permissible to place the burden of proof on a defendant who may be presently incompetent to assist his counsel in meeting that burden.

Furthermore, *Leland, supra,* 343 U.S. 790, and *Rivera, supra,* 429 U.S. 877, are equally unresponsive to the second constitutional concern identified in *DiGilio, supra,* 538 F.2d 972, 988, namely, that a rule placing the burden of proof of competency on the defendant violates due process because it creates too great a risk of an unreliable competency determination by permitting a defendant to be found competent and subjected to trial even when the evidence of competence does not outweigh the evidence of incompetence.

In *Leland, supra,* 343 U.S. 790, and *Rivera, supra,* 429 U.S. 877, the burden of proof question arose in the context of the proper allocation of burdens of proof between the prosecution and the defense with regard to the elements of an offense, on the one hand, and affirmative defenses, on the other. In *Leland* and *Rivera,* and in the more recent decision in *Martin* v. *Ohio* (1987) 480 U.S. 228 [94 L.Ed.2d 267, 107 S.Ct. 1098], the United States Supreme Court reaffirmed the constitutionality of the general common law rule placing the burden of proving an affirmative defense on the defendant. These cases simply hold that so long as the prosecution is required to meet its burden of proving all the elements of a criminal offense beyond a reasonable doubt, the Constitution does not preclude a state from placing on the defendant the burden of proving an affirmative defense.

In the present case, unlike *Leland, supra,* 343 U.S. 790, *Rivera, supra,* 429 U.S. 877, or *Martin* v. *Ohio, supra,* 480 U.S. 228, the burden of proof question does not involve a matter of allocating burdens with respect to an element of an offense or an affirmative defense. While it is true, as the

majority opinion observes, that a "defendant's competence to stand trial . . . is no more an element of the crime charged than is his sanity" (see maj. opn., *ante*, p. 884), it is equally clear that the question of a defendant's competency to stand trial is not an affirmative defense. Unlike an affirmative defense, the competency issue is not one that a defendant may raise or decline to raise at his own option. Once a question as to the defendant's competency has arisen, the controlling Supreme Court decisions establish that, as a constitutional matter, the trial court *must* hold a hearing on the question even if the defendant objects and wishes to proceed without such a hearing, and the trial of the defendant *cannot* go forward unless it is properly determined that defendant is competent to stand trial. (See, e.g., *Pate* v. *Robinson, supra*, 383 U.S. 375, 384 [15 L.Ed.2d 815, 821]; *People* v. *Marks* (1988) 45 Cal.3d 1335, 1340 [248 Cal.Rptr. 874, 756 P.2d 260].)

Contrary to the implicit suggestion of the majority opinion, the fact that a defendant's competence is not an element of an offense does *not* mean that it is constitutionally permissible to place the burden of proof of that issue on the defendant rather than on the prosecution.[2] There are numerous matters that are not elements of a criminal offense on which the prosecution, rather than the defendant, bears the burden of proof. For example, although the voluntariness or involuntariness of a confession is not an element of a crime, the Constitution requires that the prosecution, rather than the defense, bear the burden of proving voluntariness by a preponderance of the evidence. (*Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627-628, 92 S.Ct. 619].)[3] Similarly, although the statute of limitations is not an element of a crime, the prosecution, rather than the defense, bears the burden of proving by a preponderance of the evidence that the alleged crime was committed within the applicable limitations period. (See, e.g., *People* v. *Zamora* (1976) 18 Cal.3d 538, 565, fns. 26, 27 [134 Cal.Rptr. 784, 557 P.2d 75]. See generally 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 372, p. 426.)

Although the Supreme Court has not yet expressly resolved the question whether a state may properly impose the burden of proof on the competen-

---

[2] Because a defendant's competency to stand trial is not an element of a criminal offense, most decisions have held that it is constitutionally permissible for a state to require the prosecution to prove competence only by a preponderance of the evidence, rather than beyond a reasonable doubt. (See, e.g., *DiGilio, supra*, 538 F.2d 972, 988.) Nonetheless, as explained above, the great majority of decisions have held that the prosecution, rather than the defendant, must bear the burden of proof on this matter.

[3] In *Twomey*, the court stated: "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." (*Twomey, supra*, 404 U.S. 477, 489 [30 L.Ed.2d 618, 627].)

cy issue on the defendant rather than on the prosecution, its past rulings on the competency question are inconsistent with a rule placing the burden of proving incompetency on the defendant. As noted above, in *Pate v. Robinson, supra,* 383 U.S. 375, the court expressly rejected the notion that a defendant whose competency is in question may "waive" the incompetency issue, holding that once a question as to a defendant's competency to stand trial has arisen, the trial court has a constitutional obligation to ensure that the trial does not go forward until it is properly determined that the defendant is competent to stand trial. (See also *Drope v. Missouri, supra,* 420 U.S. 162, 181 [43 L.Ed.2d 103, 118-119].) If the competency of the defendant is so vital and fundamental to a fair trial that neither a defendant nor his counsel may waive the point or consent to a trial without a proper determination of the issue, it is clearly impermissible for a state to permit a defendant to be found competent to stand trial simply on the basis of the defendant's own failure to prove incompetency rather than on the basis of affirmative proof demonstrating that the defendant is competent. (See Pizzi, *Competency to Stand Trial in Federal Courts: Conceptual and Constitutional Problems* (1977) 45 U.Chi.L.Rev. 21, 57.) As the *DiGilio* court put it, in light of the Supreme Court's emphasis of the fundamental importance of a competent defendant to the basic fairness of the entire trial process, "[e]vidence showing competency must be more persuasive than that showing incompetency" before a defendant may properly be found competent to stand trial. (*DiGilio, supra,* 538 F.2d 972, 988.)

To put the matter in slightly different terms, the challenged California procedure is unconstitutional because it places too great a risk on the defendant of an erroneous determination of competency. As a number of United States Supreme Court decisions explain, procedural rules assigning the burden of proof on particular issues, or establishing the appropriate standard of proof applicable to a given issue, reflect "a societal judgment about how the risk of error should be distributed between the litigants." (*Santosky v. Kramer* (1982) 455 U.S. 745, 755 [71 L.Ed.2d 599, 607, 102 S.Ct. 1388]; see, e.g., *Addington v. Texas* (1979) 441 U.S. 418, 423-425 [60 L.Ed.2d 323, 329-331, 99 S.Ct. 1804]; *Mullaney v. Wilbur* (1975) 421 U.S. 684, 700-701 [44 L.Ed.2d 508, 514-523, 95 S.Ct. 1881].) In *Speiser v. Randall* (1958) 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332], a civil case, the court explained the practical consequences and policy considerations implicit in the assignment of the burden of proof. The *Speiser* court stated: "In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome. [Citations.] There is always in litigation a margin of error, representing error in factfinding . . . . *Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other*

*party the burden of producing a sufficiency of proof in the first instance*, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. *Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence* and convincing the factfinder of his guilt." (357 U.S. at p. 525 [2 L.Ed.2d at pp. 1472-1473], italics added.) In a competency proceeding, the risk of an erroneous determination of competency can be properly contained within permissible constitutional limits only if the prosecution is required to bear the burden of proving, by at least a preponderance of the evidence, that the defendant is competent to stand trial.

In sum, the majority opinion's reliance on the *Leland, supra,* 343 U.S. 790, and *Rivera, supra,* 429 U.S. 877, decisions is totally misplaced. Those cases simply have no bearing on the distinct constitutional problems posed by a state procedure that places the burden of proof in a competency proceeding on the defendant.

In addition to its reliance on *Leland, supra,* 343 U.S. 790, and *Rivera, supra,* 429 U.S. 877, the opinion suggests that "sound practical and policy considerations" support a rule placing the burden of proving incompetency on the defendant because the defendant and his counsel can be expected to have better access than the People to the facts relevant to the competency inquiry. (See maj. opn., *ante,* p. 885.) While the question of access to the facts of incompetency is a relevant consideration which may well justify placing the initial *burden of production,* i.e., the burden of going forward with evidence, on the defendant, it cannot justify a rule of law placing *the burden of proof* on the defendant, a rule of law that as just explained permits the trier of fact to find the defendant competent even when the evidence of competence does not outweigh the evidence of incompetence.[4] Furthermore, to the extent that the majority's argument purports to suggest that a rule placing the burden of proving competency on the prosecution is "impractical" in light of the realities of the incompetency inquiry, the opinion's

---

[4] The "model provision" on competency procedures set forth in the American Bar Association Standards for Criminal Justice speaks directly to this point. Standard 7-4.8, subdivision (c) provides in this regard: "At the [competency] hearing . . . [¶] (i) The party raising the issue of incompetence should have the burden of going forward with the evidence to show incompetence. If the defendant has moved for evaluation then the defense should have the burden of going forward; if the prosecutor or the court on its own motion or on information supplied by the prosecutor has raised the issue, then the prosecutor should have the burden of going forward. [¶] (ii) If the court, after hearing the evidence, finds by the greater weight of the evidence that the defendant is competent to stand trial the matter should proceed to trial; if not, the court should proceed to issues of treatment or habilitation to effect competence." (2 ABA Standards for Criminal Justice, std. 7-4.8 (2d ed. 1986) p. 7.208. See also *id.,* commentary to std. 7-4.8, at pp. 7.213 to 7.215.)

conclusion cannot be squared with the fact that both the federal courts and the great majority of state courts have long operated under a procedure in which the prosecution bears the burden of proof on the competency issue.

Thus, I conclude that the opinion is in error in upholding the constitutionality of Penal Code section 1369, subdivision (f) insofar as the provision establishes a presumption that a defendant is competent to stand trial and places the burden on the defendant to prove his incompetency. I agree with defendant that the trial court committed constitutional error in instructing the jury pursuant to this provision.

Finally, under the facts of this case, the error cannot properly be found harmless under the applicable standard for federal constitutional error. (See, e.g., *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) At the competency hearing in this matter, conflicting testimony was introduced as to defendant's competency to stand trial. Although a number of prosecution experts testified that, in their opinion, defendant was competent to stand trial, the psychiatrist who had the longest relationship with defendant testified that, in his view, defendant was not presently competent to stand trial. In addition, a defense investigator testified as to defendant's repeated refusal to discuss any substantive aspect of the case with him.

Furthermore, in his closing argument to the jury at the competency phase, the prosecutor made a point of emphasizing that the defendant bore the burden of proving his own incompetency. The prosecutor told the jury in this regard: "So the question is, has the defense proven that this defendant is mentally incompetent to stand trial. It's the defense burden. [¶] It's not like the regular criminal case that you have where we have the burden of proving someone guilty beyond a reasonable doubt. We don't have that burden here. [¶] It's the defense burden. The law put that burden on the defendant because otherwise you would have every defendant saying— when it's a tough case against him, every defendant would be coming in and saying, I can't cooperate with my attorney, I can't understand the charges. And you wouldn't have any trials occurring. So the law has made it tough on the defendant to try to prove that."

Under these circumstances, the constitutional error in instructing the jury that defendant bore the burden of proof on the competency issue cannot be found harmless beyond a reasonable doubt.

Accordingly, in light of the prejudicial constitutional error at the competency phase, I conclude that the judgment should be reversed in its entirety. (See, e.g., *People* v. *Marks, supra,* 45 Cal.3d 1335; *People* v. *Hale* (1988) 44 Cal.3d 531 [244 Cal.Rptr. 114, 749 P.2d 769].)

Appellant's petition for a rehearing was denied February 14, 1991. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.