Filed 9/20/21  P. v. Stevenson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE, | C089872 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF16-0002045) |
| v. | |
| STEVEN STRONG BEAR STEVENSON, | |
| Defendant and Appellant. | |

Defendant Steven Strong Bear Stevenson, driving with a blood-alcohol content of 0.15 percent, crashed into two parked cars and attempted, along with his passenger Antonio Moreno, to walk away from the scene.  When a police officer, Charanpreet Singh of the Yuba City Police Department, arrived and attempted to stop them, defendant assaulted him, ultimately slamming the officer's head into the pavement multiple times.

A jury found defendant guilty of attempted murder of a peace officer (Pen. Code, §§ 187, 664, subd. (e), count 1);[1] assault on a peace officer (§ 245, subd. (c), count 2); resisting an officer (§ 69, count 3); participation in a criminal street gang (§ 186.22, subd. (a), count 4); driving under the influence of alcohol (Veh. Code, § 23152, subd. (a), count 5); driving with a blood-alcohol content of 0.15 percent (Veh. Code, §§ 23152, subd. (b), 23578, count 6); and driving a vehicle resulting in an accident with damage to property (Veh. Code, § 20002, subd. (a), count 7). On counts 1, 2, and 3, the jury found that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and committed the offenses to assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C), (5)), but that the murder attempt was not premeditated. Defendant was sentenced to 3 years plus 15 years to life for attempted murder. Sentences on the remaining counts and enhancements were stayed or imposed concurrently.

On appeal, defendant contends (1) the trial court erred in not dismissing the jury venire after certain jurors expressed concerns about serving in a case involving members of a criminal street gang; (2) the court should not have admitted Moreno's statement threatening a police officer and declaring that he was a "Norteño" gang member made when Moreno was handcuffed in the back of a police car being transported to the police station; (3) defense counsel was ineffective in not requesting a jury instruction on voluntary intoxication; and (4) there was insufficient evidence to support the jury verdict on attempted murder.

We will affirm the judgment.

### STATEMENT OF FACTS

On August 21, 2016, about 12:20 in the morning, Curtis Castner was outside his house talking on the phone to a friend after taking out the trash. He heard a sound like an

---

[1]     All undesignated statutory references are to the Penal Code.

explosion, saw smoke and glass flying everywhere, and a car "doing doughnuts" in front of his driveway. A car came to a stop in his driveway and the car that hit it went around it, stopped, turned left across the street, and came to a stop after hitting his neighbors' Mustang in their driveway.

Around the same time, Dashonda Medina was sitting on a bench in front of her house when she heard a loud crash. She walked out in front of her house and saw a big plume of smoke and a car that had hit a parked car.

Castner saw an individual get out of the front passenger's seat of the car that hit the Mustang. He was big; his head was shaved. He walked around to the driver's side, opened the door, pulled an individual out, and held him in a kind of a bear hug. This person was a lot smaller, skinnier, and had long hair. At trial, Castner identified the man in the driver's seat as defendant. The larger man started walking away with defendant, holding him up until he could walk under this own power. Castner yelled at them that they had destroyed his neighbor's car. The big man with the shaved head looked at Castner but they kept walking.

Medina saw a person get out of the passenger seat and help a person get out of the driver's seat. They were a "little stumbly" as they crossed the street and started walking her way. Medina yelled for her family to call for help.

On August 21, 2016, at 12:20 a.m., Singh, in uniform and driving a marked patrol car, was responding to a radio call about a bar fight when he saw a car accident, made a U-turn, parked, and went to make sure everyone was okay. It looked like one car had rear-ended another car. There was no one inside the vehicles. Singh saw Castner and asked if he was okay. Castner responded that he wasn't in the wreck, pointed at two individuals across the street, and said they caused the wreck.

Singh told dispatch he was at the site of vehicle collision and walked across the street. Medina was in the middle of the street. She yelled at Singh to get his attention and told him that the two men walking towards her house were involved in the wreck.

3

Singh shined his flashlight on the two men, identified himself as Yuba City police officer, and told them to stop. They kept walking. When he was 5 to 10 feet away, Singh said it louder. The larger man was about six feet five inches tall and 270 pounds; the smaller was about five feet seven inches, 130 to 140 pounds, and had a ponytail. At trial, Singh identified defendant as the smaller man.

The men stopped; defendant turned and faced Singh. Singh asked defendant if they were driving the vehicle in the collision and defendant said no, that they were just out for a walk. Singh could smell alcohol on defendant's breath. Singh said he was trying to figure out what happened and if they were okay. He asked the men to sit down on the curb. Singh continued to smell alcohol on defendant's breath as defendant said they were fine and nothing happened. They kept walking and Singh followed, continuing to ask them to stop and sit down on the curb.

The bigger man, who Singh later learned was Moreno, turned around, took a fighting stance with clenched fists, and said, "Let's go, mother-fucker. I'm from Melton Drive." Moreno was much bigger than Singh, who was six feet, 185 pounds at the time. Singh was familiar with Melton Drive as a known gang area. The predominant gang in the area was the Norteños.

Singh believed that Moreno was going to attack him. Singh called for emergency backup, turned off his flashlight, and took out his baton, which was about 16 inches long. Singh told Moreno to get on the ground, but he did not. Moreno took a step forward and Singh struck him in the lower legs with the baton, three to five times. The baton strikes appeared to have no effect on Moreno. The next thing Singh remembered was waking up face down on the ground with his baton gone.

Medina saw Singh turn off his flashlight, take out his baton, and hit one of the men in the leg. Both men rushed Singh and caused him to fall to the ground. Medina ran into her garage to get a flashlight but couldn't find one. When she came out, one of the men was hitting Singh and one had pulled the officer to the ground. Singh hit his head.

4

Medina went into her yard and screamed for her family to call the police because Singh was down. Medina's son heard her scream and called 911.

Castner heard a female voice yelling. He saw a scuffle taking place. The two men from the wreck were attacking Singh. All three were throwing punches. It was dark and Castner could not really see over to where they were. He kept hearing the lady screaming.

Castner ran over, and, as he got closer, got a clear picture of what was going on. The bigger man was crawling to the sidewalk. Castner saw defendant crouched down by Singh slamming his head into the pavement. Defendant had his hands on either side of Singh's head. Castner could hear Singh's head hitting the concrete. The sound of someone's head hitting a hard flat surface is a distinct and scary sound that Castner had heard before. Castner saw defendant slam Singh's head into the concrete four times. Each time Castner heard the distinctive sound. Each time defendant lifted Singh's head about a foot before slamming it into the concrete. Singh was not defending himself; his arms were lying flat on the pavement. He did not appear to be conscious. Castner thought that Singh was being seriously hurt.

Medina also saw one of the men hitting Singh's head on the ground. One man was on top of Singh and one was by him. Medina saw Singh's head hitting the ground three times. The person doing it was holding Singh's head by the sides. Medina could not tell who was hitting Singh's head on the ground.

Medina went in the garage to try to find a bat to help Singh. She ran back out and was going to kick the man in the head who was on top of Singh. Singh said no and told Medina to call for help. He was not defending himself; his arms were out to the side. At that point, Singh's head was not being hit on the ground. One of the men was hitting Singh with his hands but not hitting his head on the ground.

Castner thought defendant was going to kill Singh. Castner lowered his shoulder, ran full speed, hit defendant, and knocked him off Singh. Castner fell down, attempted to

5

get back, and was on his knees when defendant started punching him. Singh was lying on the ground, not moving. Castner exchanged punches with defendant. After Castner stood up and fell back down, defendant crouched over him and threw four or five punches at Castner's head. Castner kicked defendant off of him and defendant backed up.

When Singh woke up, he heard a female screaming. He saw defendant standing over Castner, punching and kicking him. Singh got off the ground, ran towards defendant, and tackled him to the ground to stop him from attacking Castner. Defendant was squirming on the ground, resisting Singh who was on top of him. Singh got defendant's left hand cuffed and his right hand cuffed with the help of another police officer. Singh found his baton lying next to defendant.

After that, Singh remembered being in an ambulance and then in the hospital. The back of his head was hurting. He had a hematoma on the back of his head and a doctor told him he had a concussion. Singh was diagnosed with a concussion, postconcussive syndrome, and mild traumatic brain injury. Since this incident, Singh has difficulty concentrating and experienced nausea, dizziness, mood swings, and headaches. He was off work for three months. Singh tried to come back after a month but was sent back to the emergency room because he had headaches and could not concentrate.

Castner saw the bigger man sitting on the curb trying to stand up. Castner put his hand on the man's shoulder and told him to stay put, he was already in enough trouble.

A police officer transported Moreno to the holding facility at the police department. On the way, Moreno made a statement to the effect, "Just wait until I get these cuffs off, Nigger, I'm going to kill you or fuck you up." Moreno also said that he was a Norteño and that he would kill the officer.

Jonathan Knapp, testifying as an expert on the effects of alcohol on the human body, stated that he had observed individuals with blood-alcohol content of 0.15 percent or higher interacting with police officers, who knew they were talking to a police officer.

6

Yuba City Police Detective Michael Bullard testified as an expert on the Norteño criminal street gang. Based on various criteria—including defendant's prior admission to a police officer that he was a member of a set of the Norteño gang—Bullard opined that defendant was an active participant in the Norteño criminal street gang. Based on similar criteria, Bullard opined that Moreno was an active participant in the Norteño gang.

Bullard also testified that one of the "14 Bonds," the rules and codes of the Norteños, is that if a gang member showed cowardice towards, or was disrespected by, law enforcement officers, that member could be subject to violence and removed from the gang. The specific crimes alleged against defendant--assault on and attempted murder of a police officer--were in line with this bond. Bullard further testified that a Norteño gang member is expected to come to the aid another gang member involved in a fight and not doing so would be considered an act of cowardice.

The parties stipulated that on August 21, 2016, defendant drove a vehicle under the influence of alcohol, his blood-alcohol content was 0.15 percent, he struck two cars causing significant damage, and he knew he had been involved in accident but failed to provide his information to the owners or notify the police department.

**DISCUSSION**

I.

*Motion to Dismiss the Jury Venire*

Defendant contends the trial court "abused its discretion and infringed his constitutional right to a fair and impartial jury by denying his motion to dismiss the jury panel." We disagree.

In voir dire, defense counsel asked, "Any of you been affected by gang violence, gang activity, seeing gang-related events happen in the community . . . ." Prospective Juror G. responded that a restaurant property she owned had been "tagged" with graffiti. She did not know if it was gang-related because she could not read it. Prospective Juror C. said that his wife and he had moved to Yuba City from Pinole to get away from gang

7

issues in the neighborhood, which did not affect them directly, but they would be awakened in the middle of the night by police searching for people. Later asked by the prosecutor about any hesitation in finding defendant guilty if proved beyond a reasonable doubt, C. said he did not want to have to move again "because I was on a jury that found somebody else guilty and the gangs came after me." He expressed concern that gang members would know his name and repeated that he did not want to have to move from Yuba City because of a gang situation. C. said he might find defendant not guilty because of these concerns. G. said she shared this feeling, as did Prospective Juror S. but added that she could put this feeling aside. Prospective Juror No. 598246 said it "crossed my mind as well." Prospective Juror L. said that whether defendant was "some high level person" in a gang would be a factor.

The parties stipulated to excuse C. and G. for cause.

Defense counsel argued C.'s attitudes "seemed to kind of domino through the panel," such that prospective jurors who had no personal experience with gang activity exhibited "a preformed bias" tainting the panel, and therefore defendant could not be fairly tried by the panel. The prosecutor argued the panel was not tainted because the concerns raised were limited to C. and G.

The trial court granted the defense's challenge to L. for cause. The court, however, did not find that the entire panel was tainted by C.'s comments. The court observed that "it is normal behavior for certain potential jurors to be concerned about personal safety in a case such as this," but did not find that the "majority of the jurors who voiced those opinions" about the gang allegations were prejudging the case. The court concluded the proper course of action was to remove the prospective jurors who expressed hesitancy, which was done by removing C., G., and L.

At the court's suggestion, defense counsel requested, and the prosecution agreed to, a curative instruction on reasonable doubt and the presumption of innocence, which

8

the court read to the jury, having read the same instruction the previous day. The defense then exercised a peremptory challenge to S.

The standard of review applicable on this issue is abuse of discretion. (*People v. Medina* (1990) 51 Cal.3d 870, 889 (*Medina*); *People v. Martinez* (1991) 228 Cal.App.3d 1456, 1466 (*Martinez*) ["Just as a finder of fact is in a better position than the reviewing court to judge the credibility of a witness, the trial judge is in a better position to gauge the level of bias and prejudice created by juror comments."].)

In *Medina,* the California Supreme Court emphasized that dismissing the venire is a drastic measure reserved for extreme cases. "Defendant cites no case, and we have found none, indicating that such a drastic remedy is appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks. Unquestionably, further investigation and more probing voir dire examination may be called for in such situations, but discharging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (*Medina, supra*, 51 Cal.3d at p. 889.)

Case law confirms that trial courts faced with more inflammatory comments from prospective jurors than those here did not err in refusing to discharge the venire. (See, e.g., *Medina, supra*, 51 Cal.3d at p. 888 [prospective jurors reported others in the venire stating defendant's " 'own lawyers think he's guilty' " and "authorities should 'bring the guilty S.O.B. in, we'll give him a trial, and then hang him' "]; *People v. Cleveland* (2004) 32 Cal.4th 704, 735-736 [retired law enforcement officer commented that death penalty was used too seldom due to legal obstacles and he could not be fair to defendant because of his knowledge how trials are conducted]; *Martinez, supra,* 228 Cal.App.3d at pp. 1472-1473 [prospective jurors stated that defendant must be guilty because he was arrested and on trial, so the prosecution must have a strong case]; see also *People v.*

9

*Nguyen* (1994) 23 Cal.App.4th 32, 40-41 (*Nguyen*) [prospective juror expressed fear of retaliation because defendant and he were members of the Vietnamese community].)

Defendant relies on *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630 (*Mach*). In *Mach,* the defendant was charged with oral copulation of an eight-year-old girl. (*Id.* at p. 631) During voir dire, the trial judge elicited from a prospective juror, a social worker with state child protective services, that she had a "certain amount of expertise" in child abuse. (*Id.* at pp. 632-633.) The juror had worked as a social worker for three years. (*Id.* at p. 633.) The juror stated four times that she had never been involved in a case where a child had accused an adult of sexual abuse and the child's statements were not borne out. (*Ibid.*) The court excused the juror but denied a defense request for a mistrial based on a tainted jury panel. (*Id.* at p. 632.)

The Ninth Circuit found the defendant's right to an impartial jury had been violated. Given the prospective juror's "expert-like" statements, "the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated, we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused. This bias violated [the defendant's] right to an impartial jury." (*Mach, supra,* 137 F.3d at p. 633, fn. omitted.)

Here, C. made no "expert-like" statements but rather admitted he had no personal experience with gang members or gang-related incidents. His comments about moving away from a neighborhood beset by gang issues reflects what the Legislature found in promulgating the criminal street gang statute, that California "is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." (§ 186.21.)

The comments of C. and other prospective jurors suggesting that fear of gang retaliation might affect their impartiality are in the same vein as the juror's statements in *Nguyen* where the court held the trial judge did not abuse its discretion in excusing the

10

juror for cause but not dismissing the venire, the same result that occurred here. (*Nguyen, supra,* 23 Cal.App.4th at pp. 40-41.)

We conclude that the trial court did not abuse its discretion in rejecting defendant's request to dismiss the venire.

## II.

### *Moreno's Statement While Being Transported*

Defendant contends that the trial court erred in admitting Moreno's postarrest statement threatening Police Officer Michael Gwinnup and declaring Moreno's gang status, which defendant asserts "was not relevant or, if relevant, was more prejudicial than probative, resulting in a denial of appellant's fair trial due process rights."

Prior to Gwinnup testifying, defense counsel objected to testimony about statements Moreno made to Gwinnup in the police car as more prejudicial than probative. The prosecutor argued the evidence was probative to prove the gang charge under section 186.22, subdivision (a), and gang enhancements under section 186.22, subdivision (b)(1). Defense counsel countered that "[t]his remark is made after all this occurs when they're separated."

The court ruled that the evidence was highly probative to the section 186.22 gang allegations and would be admitted. The court observed that "[e]ven though the statement comes after the incident, it is immediately following the incident during the transportation of . . . Moreno to custody."

We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) "A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) A miscarriage of justice occurs only when it is

11

reasonably probable a defendant would have achieved a more favorable result in the absence of the error. (*People v. Breverman* (1998) 19 Cal.4th 142, 149.)

Relevant evidence is any evidence that has a tendency in reason to prove any disputed fact of consequence to the determination of the action. (Evid. Code, § 210.) Moreno's status as a gang member was critical to the prosecution's proof regarding both the gang participation charge under section 186.22, subdivision (a), in count 4 and the gang enhancements under section 186.22, subdivision (b), in counts 1 through 3.[2] Section 186.22, subdivision (a), "requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132.) The commission of a felony by at least two gang members is an element of the offense. (*Id.* at p. 1132.) Moreno's statement was similarly relevant to the enhancement under section 186.22, subdivision (b). "A trier of fact can rationally infer a crime was committed 'in association' with a criminal street gang within the meaning of section 186.22, subdivision (b) if the defendant committed the offense in concert with gang members." (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1021; see also *People v. Garcia* (2016) 244

---

[2] Section 186.22 provides is relevant part:

"(a) Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years.

"(b)(1) . . . any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ."

Cal.App.4th 1349, 1367 ["Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in 'association' with a gang"].)

Defendant argues the Moreno's statement as he was transported to the police station was not relevant because it "occurred after the incident was over and followed Moreno's arrest. As a result, it was too attenuated for admission." Defendant does not cite any case law to support this contention and we are aware of none. (See *People v. Ferraez* (2003) 112 Cal.App.4th 925, 929, 931 [defendant's statement regarding gang membership one month before arrest and at the time of arrest relevant to § 186.22, subd. (a) charge].)

Defendant further contends that Moreno's statement was not necessary to establish the elements of section 186.22 because of Moreno's "self-admitted gang membership" (i.e., "I'm from Melton Drive") and expert testimony that Moreno was a gang member, who had committed the instant offenses with defendant, a gang member, in an area known for gang activity. However, "evidence does not become irrelevant simply because other evidence may establish the same point." (*People v. Smithey* (1999) 20 Cal.4th 936, 973-974.)

Defendant makes essentially the same argument citing the trial court's discretion to exclude cumulative evidence under Evidence Code section 352. However, " '[e]vidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 669.) Here, evidence that Moreno expressly stated he was a Norteño after arrest is more directly probative of whether defendant committed the charged offenses with another gang member than Moreno's statement that he was from an area described by Singh as a "known gang area." As Bullard testified, the top criterion for law enforcement to validate someone as a gang member "is where someone admits their gang membership or association to that gang when they are arrested and placed in county jail," which Bullard referred to as "classification admit." Bullard

13

described this as a "stand-alone criteria where it by itself is enough . . . to consider them a gang member," because no one would admit to being a gang member knowing he would be housed with other gang members and would be subjected to violence if was not a member as claimed. To be sure, Moreno was in a police car and not yet in jail, but he was on his way there and his admission in that setting was more conclusive than his statement to Singh.

The more salient question is whether Gwinnup's testimony was unduly prejudicial, the argument in fact made by defense counsel. We note that "the weighing of probative, though possibly cumulative, evidence against its potentially prejudicial nature is a matter entrusted to the sound discretion of the trial court." (*People v. Medina* (1995) 11 Cal.4th 694, 749; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 ["The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason"].)

Defendant argues that "the vice in the admission of Moreno's post-arrest statement -- and consequently, its undue prejudice and misleading tendency -- is that it allowed Moreno's expression of intent to kill Singh and Moreno's expressed intent to kill Gwinnup to be ascribed to appellant." The flaw in this assertion is twofold. First, defendant did not object to Moreno's statement to Singh. Second, the notion that the jury would ascribe Moreno's statement to defendant is speculative. Indeed, defense counsel elicited testimony from Gwinnup on cross-examination indicating that Moreno's statement was just the belligerence of a very intoxicated person. Gwinnup testified that Moreno had a "strong odor of alcohol coming from his person" and in his opinion Moreno "was not" able to care for himself. Speculative assertions are not sufficient to carry defendant's burden to show prejudice. (*People v. Ngaue* (1991) 229 Cal.App.3d 1115, 1127.)

Moreover, as discussed below, there was other evidence of defendant's intent to kill. Two witnesses--Castner and Medina--testified to observing defendant hitting

Singh's head on the ground multiple times. Therefore, defendant cannot show that he would have received a more favorable result in the absence of the evidence of Moreno's postarrest statement. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 194 ["The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded."].)

III.

*Ineffective Assistance of Counsel*

Defendant "contends his trial counsel was prejudicially ineffective for failing to request a jury instruction on voluntary intoxication." He argues there was substantial evidence supporting voluntary intoxication, including his driving erratically, striking a parked car on the street and another in a driveway, having to be helped out of the car to walk away, the alcohol odor Singh noticed, and his blood-alcohol content of 0.15 percent. We conclude that defendant did not receive ineffective assistance of counsel.

"[E]vidence of voluntary intoxication [is] relevant on the issue of whether the defendant actually formed any required specific intent." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243.) In an attempted murder case, voluntary intoxication may be relevant on the issue of intent to kill. (§ 29.4.) However, in *People v. Soto* (2018) 4 Cal.5th 968, the California Supreme Court held that the jury may "consider evidence of voluntary intoxication on the question of whether defendant intended to kill but not on the question of whether he believed he needed to act in self-defense," (*id.* at p. 970) overruling the Court of Appeal which concluded that voluntary intoxication could be considered on a claim of imperfect self-defense.[3] (*Id.* at p. 973.)

---

[3] Defendant acknowledges the impact of *Soto* but argues that defense counsel in closing argument regarding self-defense told the jury "to carefully think about appellant's

15

The trial court instructed the jury that imperfect self-defense or defense of another would reduce the attempted murder charge to attempted manslaughter and perfect self-defense would require the jury to find defendant not guilty of any crime. The difference between perfect and imperfect self-defense depended on whether defendant's belief in the need to use deadly force was reasonable. In evaluating defendant's beliefs, the burden was on the prosecution to prove beyond a reasonable doubt that defendant was not acting in imperfect self-defense, and if this burden was not met, the jury was required to find defendant not guilty of attempted murder. The court also instructed the jury that self-defense was also a defense to the assault claims. But "[v]oluntary intoxication is not a defense to assault." Defendant does not dispute that these instructions were properly given and correct statements of the law.

In closing, defense counsel argued for both perfect and imperfect self-defense, and told the jury that, if either applied defendant did not intend to kill. On perfect self-defense, counsel argued that if Singh "just started batoning . . . Moreno from behind," this was perfect self-defense. If the jury believed "it's slightly more likely true that the officer is right, . . . Moreno still gets batoned and you might get to imperfect self-defense. But it still doesn't make [defendant] guilty of intent to kill under any circumstances or any reading of the facts." Counsel emphasized that "to get past self-defense . . . you got to reject the idea that . . . Moreno was not the aggressor. That the officer was. And then once you get past that you got to say what the officer did was reasonable in batoning . . .

---

state of mind in light of the evidence of intoxication," therefore counsel's argument "did not render the voluntary intoxication instruction inconsistent with his defense." To the extent that defense counsel acknowledged that voluntary intoxication constituted an alternative defense theory to self-defense, counsel's strategic decision to rely on one exculpatory theory does not amount to ineffective assistance merely because other theories are possible. "[C]ounsel does render ineffective assistance by choosing one or several theories of defense over another." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007; *People v. Thomas* (1992) 2 Cal.4th 489, 531-532.)

16

Moreno even though he had just mouthed off and hadn't done anything yet. That's all the stuff you got to get behind and get past to get past possibly perfect self-defense."

As to the assault claims, defense counsel argued "[y]ou have to find all the elements there to be true and then find there was no self-defense."

" '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' [Citations.]" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

The California Supreme Court has observed: "It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted.)

"In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Here, we can conceive of a tactical reason for not requesting a voluntary intoxication instruction. Defense counsel sought to focus the jury on the scenario of Singh being the initial aggressor in batoning Moreno and, accordingly, defendant engaging in reasonable--and therefore perfect--defense of Moreno, which could lead to a

17

complete acquittal on the attempted murder charge. A finding of voluntary intoxication would only reduce attempted murder to attempted manslaughter. If the jury found defense of Moreno unreasonable--i.e., imperfect--defendant could still be found not guilty of attempted murder. Moreover, the jury could consider perfect or imperfect self-defense but not voluntary intoxication on the assault claims. Counsel could have determined that requesting an instruction on voluntary intoxication would distract the jury from focusing on the fact that Singh struck Moreno first in the encounter, the key consideration for defendant's self-defense claims to the attempted murder and assault charges.

We conclude that defense counsel did not render ineffective assistance of counsel in failing to request an instruction on voluntary intoxication.

IV.

*Sufficiency of Evidence of Intent to Kill*

Defendant contends "there was no evidence of intent to kill sufficient to support the verdict of attempted murder." This claim has no merit.

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence— that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt. [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

To support an attempted murder conviction requires sufficient evidence of defendant's specific intent to kill and commission of a direct but ineffectual act to accomplish the killing. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Attempted murder involves express malice--either the defendant desires the victim's death or knows

18

to a substantial certainty that death will occur. (*Ibid.*) Direct evidence of the defendant's mental state is rare. (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Intent is usually derived from defendant's actions and the circumstances of the crime. (*Ibid.*) Intent to kill may be inferred from the fact that defendant attacks a vulnerable area of the body. (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1114.)

Defendant argues that the evidence was insufficient to support an intent to kill, because while "impacting a head against a sidewalk or cement surface can have fatal consequences," his "actions fell short of causing any skull fracture," which suggested that defendant "did not use force consistent with an intent to kill." Not so. The human head is a vulnerable area of the body. Castner saw defendant "slamming . . . Singh's head into the pavement" four times. Each time Castner could hear a distinctive and "scary" sound as Singh's head hit the concrete. Defendant was using force and effort to slam Singh's head into the concrete. Defendant lifted Singh's head up a foot before slamming it in the concrete. Singh was unconscious and not defending himself.

The fact that Singh did not suffer a fractured skull is immaterial to whether defendant's actions evidenced an intent to kill. (*People v. Avila* (2009) 46 Cal.4th 680, 702 ["[T]he degree of the resulting injury is not dispositive of defendant's intent. Indeed, a defendant may properly be convicted of attempted murder when no injury results."].) In any case, Singh did suffer a serious injury. Singh had a hematoma on the back of his head and a concussion. He could not work for three months because of, among other things, difficulty concentrating, nausea, dizziness, and headaches. He tried to come back after a month but ended up in the emergency room because of headaches and inability to concentrate.

We conclude that defendant's attempted murder conviction was supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

                                        /s/
                                        HOCH, J.

We concur:

 /s/
HULL, Acting P. J.

 /s/
MURRAY, J.